Monica L. McDowell ELVIG,
Plaintiff–Appellant,

v.

CALVIN PRESBYTERIAN CHURCH;
Will Ackles, Defendants–
Appellees.

No. 02–35805.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 2003.

Filed July 23, 2004.

Judith A. Lonnquist, Seattle, WA, for the plaintiff-appellant.

Elizabeth K. Reeve, Reeve Shima, P.C., Seattle, WA, for the defendants-appellees.

Gwynne Skinner and Kathy Barnard, Seattle, WA, for amicus curiae Northwest Women's Law Center.

Paul Berks, Robert L. Byer, and Thomas R. Johnson, Kirkpatrick & Lockhart, LLP, Pittsburgh, PA, for amicus curiae Presbyterian Church (U.S.A.) Synod of Alaska Northwest.

Before TROTT, FISHER and GOULD, Circuit Judges.

GOULD, Concurence, TROTT, Dissent.

## INTRODUCTION

FISHER, Circuit Judge.

Plaintiff Monica L. McDowell Elvig ("Elvig"), an ordained Presbyterian minister, brought claims under Title VII against her employer Calvin Presbyterian Church, North Puget Sound Presbytery (together the "Church") and her supervisor Pastor Will Ackles (collectively "Defendants"), alleging that she was sexually harassed and retaliated against by the Defendants. The district court dismissed Elvig's complaint, concluding that her Title VII claims fell within the scope of the so-called "ministerial exception" to Title VII. This exception saves Title VII from unconstitutionality under the First Amendment by requiring that Title VII suits be dismissed when they would impermissibly encroach upon the free exercise rights of churches or excessively entangle government and religion.

Applying our decision in *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940 (9th Cir.1999), we reverse and remand. Under the ministerial exception, a church's decisions about whom to employ as a minister are protected by the First Amendment. Thus to the extent Elvig's sexual harassment and retaliation claims implicate the Church's ministerial employment decisions, those claims are foreclosed. Nonetheless, Elvig has stated narrower and thus viable sexual harassment and retaliation claims that do not implicate protected employment decisions. Elvig's sexual harassment claim can succeed if she proves that she suffered a hostile work environment and if the Defendants do not prove that Elvig unreasonably failed to take advantage of available measures to prevent and correct that hostile environment. Elvig's retaliation claim can succeed if she proves that she suffered retaliatory harassment—here, in the form of verbal abuse and intimidation—because of her complaints to the Church and the U.S. Equal Employment Opportunity Commission ("EEOC"). Should the Church be found liable on either of these claims, Elvig may recover damages for consequent emotional distress and reputational harm. Within this framework, Elvig's Title VII suit can provide her with redress for sexual harassment and retaliation without attaching liability to ministerial employment decisions protected by the First Amendment.

## BACKGROUND

Because this case comes to us on the pleadings only, we must assume the facts Elvig alleges in her complaint are true. According to her, she served as the Associate Pastor of Calvin Presbyterian Church from December 2000 to December 2001. Shortly after she took this position, defendant Will Ackles, the Church's Pastor, engaged in sexually harassing and intimidating conduct toward her, creating a hostile working environment. Invoking Church procedures, Elvig made a formal complaint

of sexual harassment against Ackles to the Church, which she says took no action to stop the harassment or alleviate the hostile working environment. For his part, Ackles retaliated against her by relieving her of certain duties, verbally abusing her and otherwise engaging in intimidating behavior. Again, the Church, which knew or should have known of Ackles' improper behavior, failed to act.

Elvig filed a charge of discrimination with the EEOC in October 2001 and received a right-to-sue letter in December 2001. The Church placed her on unpaid leave on December 4, 2001, and the Presbytery voted later that month to terminate its employment relationship with her. The Presbytery subsequently notified Elvig that its Committee on Ministry had decided against permitting Elvig to circulate her church resume, or "personal information form," effectively preventing her from acquiring other pastoral employment in any Presbyterian church in the United States. Elvig then filed a second charge of discrimination with the EEOC alleging unlawful retaliation and, on March 25, 2002, received a second right-to-sue letter.

Elvig timely filed a complaint in federal district court for the Western District of Washington. The complaint asserted federal causes of action for sexual harassment, hostile work environment and retaliation, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as well as state law claims for defamation, negligent supervision and violations of the Washington Law Against Discrimination, Wash. Rev.Code §§ 49.60.210 and 49.60.220. Elvig sought back pay, front pay and damages for emotional distress and harm to her reputation. She also sought injunctive relief, including a preliminary injunction requiring the Defendants to permit her to circulate her personal information form.

The district court dismissed Elvig's Title VII suit under Rule 12(b)(6) for failure to state a claim. The court concluded that Elvig's allegations implicated the Church's constitutionally protected right to choose its ministers and were, therefore, barred by the ministerial exception to Title VII. The district court concluded that consideration of Elvig's claims would violate the Church's freedom of religion under the First Amendment's Free Exercise Clause, interjecting the court into ecclesiastical decision-making and involving it in the Church's choice of its ministers. Moreover, the court concluded that reviewing Elvig's retaliation claims would cause government entanglement with the Church's internal governance, in violation of the Establishment Clause. Having dismissed the federal claims, the court declined jurisdiction over the remaining state claims and dismissed them as well. Elvig timely appealed.

## DISCUSSION

### I. PROCEDURAL ISSUES

#### A.

In dismissing Elvig's complaint, the district court mistakenly applied Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion must be made *before* the responsive pleading. Fed.R.Civ.P. 12(b)(6). Here, the Defendants filed their motion to dismiss *after* filing their answer. Thus, the motion should have been treated as a motion for judgment on the pleadings, pursuant to Rule 12(c) or 12(h)(2). *Aldabe v. Aldabe,* 616 F.2d 1089, 1093 (9th Cir. 1980). In this appeal, therefore, we treat the district court's dismissal as a grant of a motion for judgment on the pleadings.

*Id.*[1]

We review de novo a district court's dismissal of a complaint for judgment on the pleadings. *See Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir.2001). At this stage in the proceedings, we accept as true all allegations in Elvig's complaint and treat as false those allegations in the answer that contradict Elvig's allegations. *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1301 & n. 2 (9th Cir.1992).

## B.

The Defendants contend that the First Amendment requires us to dismiss Elvig's claims for want of subject matter jurisdiction.[2] We disagree. Federal question jurisdiction is statutorily established, giving district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Elvig brings federal claims under 42 U.S.C. § 2000e. A Rule 12 judgment on the pleadings is not equivalent to a dismissal for failure to establish federal question jurisdiction under 28 U.S.C. § 1331, and a judgment on the pleadings may be appropriate even when federal question jurisdiction is established. As we explained in *Bollard*, "[a]ny nonfrivolous assertion of a federal claim suffices to establish federal question jurisdiction, even if that claim is later dismissed on the merits." *Bollard*, 196 F.3d at 951; *see also Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.... [T]he failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."). We therefore hold that the ministerial exception does not require us to dismiss Elvig's claims for lack of subject matter jurisdiction.

## II. *BOLLARD*: SETTING THE PARAMETERS

In recognition of the tension between the statutory protection Title VII provides to victims of sexual harassment and the constitutional protection religious institutions enjoy under the First Amendment, courts have crafted a "ministerial exception" to Title VII "in order to insulate the relationship between a religious organization and its ministers from constitutionally impermissible interference by the government." *Bollard*, 196 F.3d at 945; *see, e.g., EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 800–01 (4th Cir. 2000). For this Circuit, *Bollard* estab-

---

1. The order dismissing Elvig's claims cites to evidence outside the scope of the pleadings. The inclusion of this material was improper, as review for failure to state a claim is generally limited to the contents of the complaint. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.2002). The district court did not rely on these extraneous materials in dismissing Elvig's complaint, however, and we do not rely on the them here. We therefore disregard the materials and treat the district court's order as a judgment on the pleadings. *See Keams v. Tempe Technical Inst., Inc.*, 110 F.3d 44, 46 (9th Cir.1997).

2. In the same filing in which they moved to dismiss Elvig's complaint under Rule 12(b)(6), the Defendants also moved to dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. Because the Rule 12(b)(1) motion, like the Rule 12(b)(6) motion, was made after the Defendants' responsive pleading, "it was technically untimely." *Augustine v. United States*, 704 F.2d 1074, 1075 n. 3 (9th Cir.1983). "The matter of subject matter jurisdiction, however, may be raised by the parties at any time pursuant to Fed.R.Civ.P. 12(h)(3), and the[De-fendants'] motion was thus properly before the [district] court as a Rule 12(h)(3) suggestion of lack of subject matter jurisdiction." *Id.*

lishes the exception's parameters. As the present case demonstrates, applying the principles set forth in *Bollard* requires a nuanced analysis in order to avoid trenching on religious freedom without entirely eviscerating Congress' "otherwise fully applicable command[ ]" to protect employees from sex discrimination—even employees of religious organizations. *Bollard,* 196 F.3d at 944; *see also id.* at 948 ("[T]he strength of the government's interest, expressed in the text of Title VII, in protecting employees against sexual harassment is difficult to overstate. As we have said previously, it is a matter of the 'highest priority.' " (quoting *EEOC v. Pac. Press Publ'g Ass'n,* 676 F.2d 1272, 1280 (9th Cir.1982))). Because of its importance to our analysis here, and to identify the extent to which Elvig's circumstances replicate or extend beyond those addressed in *Bollard,* we shall first review *Bollard* in some detail.

### A.

John Bollard was a novitiate in the Society of Jesus, an order of Roman Catholic priests commonly known as the Jesuits. Bollard's Title VII claim alleged that his superiors "sent him pornographic material, made unwelcome sexual advances, and engaged him in inappropriate and unwelcome sexual discussions." 196 F.3d at 944. Bollard claimed that the harassment was so severe and the Jesuits' response so inadequate that he left the Jesuit order before taking vows to become a priest. *Id.* The Jesuits argued that the ministerial exception to Title VII barred Bollard's claim, but we held otherwise, concluding that Bollard's claim survived both Free Exercise and Establishment clause inquiries.

The Free Exercise clause prohibits courts from "decid[ing] among competing interpretations of church doctrine, or other matters of an essentially ecclesiastical na-

ture." *Bollard,* 196 F.3d at 946. Accordingly, *Bollard* explained:

> A church must retain unfettered freedom in its choice of ministers because ministers represent the church to the people.... Indeed, the ministerial relationship lies so close to the heart of the church that it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decisions.

*Id.* Despite this constraint, Bollard's claim survived Free Exercise clause scrutiny because (1) the Jesuits"d[id] not offer a religious justification for the harassment Bollard allege[d]," and (2) neither Bollard nor the Jesuits alleged that the Jesuits had ever sought to prevent Bollard from taking the vows for priesthood. *Id.* at 947. Thus, Bollard's claim implicated neither "the Jesuit order's choice of representative" nor other conduct implicating church doctrine. *Id.* Absent a religious justification for the harassment Bollard alleged or a protected, ministerial choice that Bollard's suit would second-guess, the Jesuits' First Amendment argument boiled down to a "generalized and diffuse concern for church autonomy" that did not trigger the ministerial exception. *Id.* at 948.

Turning to the Establishment clause, *Bollard* applied the test promulgated by *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971): "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Id.* at 612–13, 91 S.Ct. 2105; *see Bollard,* 196 F.3d at 948. In Title VII claims against religious employers, the relevant criterion is entanglement, which has both substantive and procedural dimensions.

Entanglement's substantive dimension is implicated "if the church's freedom to choose its ministers is at stake. A religious organization's decision to employ or to terminate employment of a minister is at the heart of its religious mission." *Bollard*, 196 F.3d at 949. Having already concluded, in its Free Exercise clause analysis, that Bollard's suit did not second-guess the Jesuits' ministerial choices, *Bollard* similarly concluded that the suit did not impermissibly promote substantive entanglement between church and state. *Id.*

Entanglement's procedural dimension is implicated by "a protracted legal process pitting church and state as adversaries." *Bollard*, 196 F.3d at 949 (quoting *Rayburn v. Gen. Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1171 (4th Cir.1985) (citing *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.")))). Moreover,

> the dangers of procedural entanglement are most acute where there is also a substantive entanglement issue. Where such a concern is absent, procedural entanglement considerations are reduced to the constitutional propriety of subjecting a church to the expense and indignity of the civil legal process.

*Bollard*, 196 F.3d at 949 (citations omitted). Because Bollard's suit presented no great danger of substantive entanglement and involved only secular inquiries, the procedural entanglement it entailed was "no greater than that attendant on any other civil suit a private litigant might pursue against a church." *Id.* at 950; *see also Roman Catholic Diocese*, 213 F.3d at 801 ("Where no spiritual function is involved, the First Amendment does not stay

the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides."). Thus, "the entanglement between church and state that would result if Bollard pursued his sexual harassment claim [was] not sufficiently significant to violate the Establishment Clause." *Bollard*, 196 F.3d at 949.

Ultimately, we reasoned that the issue to be adjudicated was "whether Bollard was subjected to sex-based harassment by his superiors that was sufficiently severe or pervasive to be actionable under Title VII," and that the Jesuits could assert as an affirmative defense that they "exercised reasonable care to prevent and correct the harassment, and that Bollard failed to take advantage of these opportunities to avoid or limit harm." *Bollard*, 196 F.3d at 949–50 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751–52, 764–65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Thus, we concluded:

> This is a restricted inquiry. Nothing in the character of this defense will require a jury to evaluate religious doctrine or the "reasonableness" of the religious practices followed within the Jesuit order. Instead, the jury must make *secular judgments* about the nature and severity of the harassment and what measures, if any, were taken by the Jesuits to prevent or correct it. The limited nature of the inquiry, combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters.

*Bollard*, 196 F.3d at 950 (emphasis added).

## B.

As in *Bollard*, Elvig must as a predicate to a sexual harassment claim prove that Pastor Ackles' alleged conduct was severe and pervasive. *See Ellerth*, 524 U.S. at

754, 118 S.Ct. 2257. And to the extent relevant, the Church may have an affirmative defense that it exercised reasonable care to prevent or correct harassment and that Elvig failed to take advantage of preventive or corrective opportunities. *See id.* at 765, 118 S.Ct. 2257; *Bollard,* 196 F.3d at 950. Moreover, although Elvig has pled claims for both retrospective and prospective damages and unspecified injunctive relief, in light of *Bollard's* heavy reliance on Bollard's claiming only limited, retrospective damages, *id.,* Elvig's remedies must be similarly limited. So limited, Elvig's claim for retrospective damages would appear to fall within the *Bollard* parameters of secular inquiry, and outside those of the ministerial exception. The question then becomes whether her circumstances or the nature of her claims takes her beyond *Bollard* and reverses the equation.

There are two obvious differences between this case and *Bollard.* First, Bollard was not an ordained minister, only a novitiate. We do not find this distinction to be material, however, and do not read *Bollard* itself as drawing such a distinction. *Bollard* regarded the plaintiff as a minister, *see, e.g., Bollard,* 196 F.3d at 947 (observing that "a minister is the target . . . of the harassing activity" and referring to the "church-minister employment relationship"), and nowhere relied on Bollard's novitiate status in the opinion. Other federal circuit courts have adopted similar approaches, looking to the function of the position rather than to ordination in deciding whether the ministerial exception applies to a particular employee's Title VII claim.[3] Thus, we accept *Bollard* as treating a novitiate as a "minister" for the purposes of the ministerial exception.

■ Second, and quite significantly, unlike Bollard—whom the Jesuits professed to want to remain a member of the order—Elvig was terminated by the Church and foreclosed from seeking employment in other Presbytery parishes. Thus Elvig's claims do in certain respects very much involve the Church's decision-making about who shall be a minister of the Church—a decision clearly within the scope of the ministerial exception and to which, as *Bollard* put it, we must "simply defer without further inquiry." *Id.* at 947. Accordingly, to the extent Elvig's claims necessarily involve an inquiry into the Church's *decision* to terminate her ministry, those claims cannot proceed in civil court and were properly dismissed. As we shall explain, however, that does not mean the entirety of her Title VII claims must likewise be foreclosed.

---

3. *See, e.g., Alicea–Hernandez v. Catholic Bishop of Chi.,* 320 F.3d 698, 703 (7th Cir.2003) ("In determining whether an employee is considered a minister for the purposes of applying [the ministerial] exception, we do not look to ordination but instead to the function of the position."); *Roman Catholic Diocese,* 213 F.3d at 801 ("Our inquiry . . . focuses on 'the function of the position' at issue and not on categorical notions of who is or is not a 'minister.' "); *Starkman v. Evans,* 198 F.3d 173, 175 (5th Cir.1999) (holding that a choir director qualified as a "minister" for purposes of the ministerial exception because she "perform[ed] ministerial functions that warrant the First Amendment's protections against un-due interference with the personnel decisions of churches and religious leaders"); *EEOC v. Catholic Univ. of Am.,* 83 F.3d 455, 463 (D.C.Cir.1996) ("[T]he ministerial exception encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission."); *cf. Bryce v. Episcopal Church in the Diocese of Colo.,* 289 F.3d 648, 652, 658 n. 2 (10th Cir.2002) (observing that "[c]onsideration of the ministerial exception would require us to determine whether Bryce . . . was a 'minister' for purposes of [the ministerial] exception," where Bryce was not ordained as a minister).

### III. ELVIG'S SEXUAL HARASSMENT CLAIM

#### A.

Elvig claims that Pastor Ackles and the Church created a hostile work environment, which culminated in several tangible employment actions that occurred after she complained to the Church and later to the EEOC about that environment. These actions included the removal of certain duties by Pastor Ackles, then her suspension and termination by the Church and finally the Committee on Ministry's refusal to permit the circulation of her personal information form.

To prevail on a sexual harassment claim, a plaintiff must establish a "pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir. 1998). Elvig may, consistent with the First Amendment, attempt to show that she was sexually harassed and that this harassment created a hostile work environment. *Bollard*, 196 F.3d at 949–50. This showing would, after all, involve a purely secular inquiry. Assuming Elvig can prove a hostile work environment, the Church may nonetheless invoke First Amendment protection from Title VII liability if it claims that her subjection to or the Church's toleration of sexual harassment was doctrinal. We do not scrutinize doctrinal justifications because "[i]t is ... not our role to determine whether the Church had a secular or religious reason for the alleged mistreatment of [Elvig]." *Alicea–Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 703 (7th Cir.2003). As in *Bollard*, however, the Defendants here "do not offer a religious justification for the harassment [Elvig] alleges," *Bollard*, 196 F.3d at 947, and, indeed, deny it occurred at all.

In *Ellerth* and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court provided a framework for assessing an employer's liability where the plaintiff can show that she was subjected to a hostile environment. Within this framework, there are two, alternative theories under which a plaintiff may establish an employer's vicarious liability for sexual harassment. First, an employer is vicariously liable for a hostile environment that "culminates in a tangible employment action." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275. Second,

> when no "tangible employment action" has been taken, an employer may raise "an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." The affirmative defense has two prongs: (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) "that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Whether the employer has a stated anti-harassment policy is relevant to the first element of the defense. And an employee's failure to use a complaint procedure provided by the employer "will normally suffice to satisfy the employer's burden under the second element of the defense."

*Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 877 (9th Cir.2001) (quoting *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257). Moreover, even if a tangible employment action occurred, an employer may still assert the affirmative defense if the tangible employment action "was unrelated to any harassment or complaint thereof." *Nichols*, 256 F.3d at 877; *see also* B. Lindemann & P. Grossman, Employment Discrimination

Law 609 & nn. 160–63 (C. Geoffrey Weirich ed., 3d ed.2002 supp.).

Thus, when a plaintiff proves that she was subjected to a hostile environment, the next and potentially final step in the typical Title VII case is to ascertain whether she suffered a tangible employment action related to that hostile environment. What makes this case atypical, however, is that each tangible employment action Elvig alleges implicates the Church's constitutionally protected prerogative "to choose [its] representatives free from government interference and according to the dictates of faith and conscience." *Bollard,* 196 F.3d at 945.

Because there is a "protected-choice rationale" for the Defendants' tangible employment actions in this case, *Bollard,* 196

F.3d at 947, we conclude as a matter of law that those actions must be treated as if they were "unrelated to any harassment or complaint thereof," *Nichols,* 256 F.3d at 877. We also conclude, however, that although Elvig cannot rely on showing that she suffered sexual harassment "culminat[ing] in a tangible employment action," she may nonetheless hold the Church vicariously liable for the sexual harassment itself unless the Church can satisfy the *Ellerth/Faragher* affirmative defense. *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 808, 118 S.Ct. 2275.[4]

**B.**

**1.**

■ A tangible employment action is "a significant change in employment status,

4. Although the dissent speculates about what our sister circuits *would* do if required to decide whether the ministerial exception exempts churches from any obligation to exercise reasonable care in responding to sexual harassment complaints by ministers, *Bollard* remains the only federal appellate court decision to have discussed this question. Several state and federal court opinions are nonetheless consistent with *Bollard's* approach. *See Van Osdol v. Vogt,* 908 P.2d 1122, 1129 & n. 11 (Colo.1996) (observing that First Amendment would not bar hostile work environment claims "that do not stem directly from a hiring or discharge decision"); *Black v. Snyder,* 471 N.W.2d 715, 721 (Minn.Ct.App.1991) (holding that state law sexual harassment claims involving conduct occurring during pastor's employment relationship were "unrelated to pastoral qualifications or issues of church doctrine"); *McKelvey v. Pierce,* 173 N.J. 26, 800 A.2d 840, 858 (2002) ("Obviously, sexual harassment is not doctrinally based, a protected choice, or inherent in church administration."); *cf. Sanders v. Casa View Baptist Church,* 134 F.3d 331, 338–39 (5th Cir.1998) (affirming summary judgment for church based on plaintiff's failure of proof on hostile environment claim, without relying on the First Amendment), *aff'g* 898 F.Supp. 1169, 1181–82 (N.D.Tex.1995) (holding minister's breach of contract and wrongful discharge claims against his church were barred

by First Amendment); *Smith v. Raleigh Dist. of N.C. Conference of United Methodist Church,* 63 F.Supp.2d 694, 718 (E.D.N.C. 1999) (holding judicial review of Title VII suit by lay employees against church would not violate the First Amendment because "[t]he court need review the actions taken by defendants in response to plaintiffs' reports of [the harassing minister's] harassment only to determine whether defendants took some action reasonably calculated to bring an end to the hostile working environment").

The Seventh Circuit would perhaps sweep up Elvig's claim within its blanket statement that "[t]he 'ministerial exception' applies without regard to the type of claims being brought." *Alicea–Hernandez,* 320 F.3d at 703 (dismissing Title VII claim brought by Hispanic Communications Manager because she was responsible for publicly conveying the church's message, where plaintiff alleged she resigned after facing discrimination). *Alicea–Hernandez* derived this broad statement from the Fourth Circuit's conclusion that "[t]he exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision." *Id.* (quoting *Roman Catholic Diocese,* 213 F.3d at 802). Like the Fourth Circuit, *Bollard* refused to inquire into protected ministerial decisions. Unlike the Seventh Circuit, *Bollard* did not presume that all Title VII claims implicate such decisions.

such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257; *see also Nichols*, 256 F.3d at 877. Here, Elvig alleges four tangible employment actions— (1) the removal of certain duties, (2) her suspension, (3) her termination and (4) the refusal to permit the circulation of her personal information form—each of which involves the exercise of power over Elvig's ability to perform "spiritual functions." *Roman Catholic Diocese*, 213 F.3d at 801. Even the decision regarding Elvig's personal information form, in which the Committee on Ministry arguably prevented other parishes from exercising their judgments about Elvig's pastoral worth, is beyond our purview because it clearly involves the Presbytery's process of pastoral selection. *Cf. Bollard*, 196 F.3d at 947 ("Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church." (quoting *McClure v. Salvation Army*, 460 F.2d 553, 559 (5th Cir.1972))); *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir.2000) ("A church's view on whether an individual is suited for a particular clergy position cannot be replaced by the courts' [view] without entangling the government 'in questions of religious doctrine, polity, and practice.'" (quoting *Jones v. Wolf*, 443 U.S. 595, 603, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979))). Because the four tangible employment actions Elvig alleges concern the Defendants' "choice of ministers," the Defendants retain "unfettered freedom" to take those actions without incurring Title VII liability. *Bollard*, 196 F.3d at 946.

That the tangible employment action inquiry looks not only to *whether* but also to *why* the employment action occurred raises additional concerns, because the particular employment actions Elvig alleges are also ministerial decisions protected by the First Amendment. *See Nichols*, 256 F.3d at 877. Elvig might argue, for example, that the Church's ministerial choices affecting her were part of the harassment she suffered, and therefore that any doctrinal or secular explanation dissociating those actions from harassment would be insincere or pretextual. But a judicial inquiry into this argument would, as a practical matter, necessarily create First Amendment problems:

> [W]e cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread, the internal management of a church.

*Bollard*, 196 F.3d at 946 (quoting *Combs v. Cent. Tex. Annual Conference of United Methodist Church*, 173 F.3d 343, 350 (5th Cir.1999)). Moreover, proving that a church's asserted justification for a protected employment decision was pretextual would come to nothing. A church's selection of its ministers is unfettered, and its true reasons—whatever they may be—are therefore unassailable. Thus, "it would offend the Free Exercise Clause simply to require the [C]hurch to articulate a religious justification for its personnel decisions." *Bollard*, 196 F.3d at 946; *see also Rayburn*, 772 F.2d at 1169 ("[T]he free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it."). Because the Church cannot be required to articulate a

justification for its ministerial decisions, Elvig cannot show that those decisions were tangible employment actions related to the hostile environment to which she was subjected.

### 2.

That said, insulating the Church's employment decisions does not foreclose Elvig from holding the Church vicariously liable for the alleged sexual harassment itself, which is not a protected employment decision.[5] In *Bollard*, we accepted that Bollard had abandoned the novitiate program because of the hostile work environment, not because the Jesuits terminated him or took any other tangible employment action against him. Thus we treated his claim as one proceeding under the *Ellerth/Faragher* affirmative defense paradigm, rather than as one relying on a tangible employment action. *Bollard*, 196 F.3d at 949–50. Here, Elvig is functionally in a comparable position—not because she suffered no employment actions as a matter of fact, but because she cannot reach those actions as a matter of law. Thus, as in *Bollard*, Elvig has alleged facts upon which she may rely without triggering the ministerial exception and which suffice to allege a prima facie case of a Title VII violation.

■ In Title VII actions against secular employers, plaintiffs who suffer tangible employment actions but cannot connect those actions to harassment may nonetheless recover for the harassment itself *if* their employers cannot satisfy the *Ellerth/Faragher* affirmative defense. In *Nichols*, for example, we rejected a co-plaintiff's argument that his employer "may not assert the affirmative defense because he suffered a tangible employment action." 256 F.3d at 877. Although the co-plaintiff,

Sanchez, was indeed fired, we ignored that firing and held that the *Ellerth/Faragher* affirmative defense was available to the employer, because:

> Sanchez's termination was unrelated to any harassment or complaint thereof. Moreover, before being fired, Sanchez was not demoted or reassigned, and did not receive a cut in pay or benefits. Because Sanchez was not subjected to any tangible adverse employment action, we consider the merits of Azteca's affirmative defense.

*Id.; see also Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312, 1317 (11th Cir.2001) (concluding that "Frederick failed to present sufficient evidence to establish any causal link between the adverse 'tangible employment action' she suffered and the alleged harassment," and "remand[ing] on Frederick's no adverse tangible employment action claim" for an inquiry into the employer's affirmative defense); *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 182 (4th Cir.1998) ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense. If Lissau's termination did not result from a refusal to submit to Castillero's sexual harassment, then Southern may advance this defense."); *Newton v. Cadwell Labs.*, 156 F.3d 880, 883–84 (8th Cir.1998) (affirming the district court's finding that the plaintiff's discharge was unrelated to her supervisor's advances and holding that employer was entitled to assert affirmative defense on remand).

Given that the Defendants may not constitutionally be required to explain or justify the alleged tangible employment actions, Elvig, like Mr. Sanchez in *Nichols*, cannot establish a connection between those actions and the hostile environment

---

5. As noted previously, the Defendants do not assert a religious justification for the alleged

sexual harassment; they deny it occurred at all.

to which she was subjected. As in *Nichols*, we must ignore actions by the employer that the plaintiff cannot link to the sexual harassment—here, by operation of law. But that does not defeat Elvig's underlying sexual harassment claim; rather, it simply means that, as *Nichols* illustrates, the Church may invoke the *Ellerth/Faragher* affirmative defense to avoid vicarious liability for Pastor Ackles' alleged harassment.

**3.**

Permitting the Church to raise the affirmative defense also takes all protected employment decisions out of the equation, thus assuring that the Church's liability under Title VII will not be based on the decisions to reduce Elvig's duties, to suspend her, to terminate her employment or to refuse to allow her to circulate her personal information form. Instead, "the only relevant decision[s]" implicated here are Pastor Ackles' supposed decision to harass Elvig and the Church's "decision not to intervene to stop or curtail the sexual harassment [Elvig] reported." *Bollard*, 196 F.3d at 947. These alleged decisions to engage in and permit harassment are insufficient to trigger the ministerial exception. *Id.*

Again, the Church could invoke First Amendment protection from Title VII liability if it claimed doctrinal reasons for tolerating or failing to stop the sexual harassment Elvig alleges. The Church has pled no such religious justification; rather, it denies the harassment occurred at all and contends that, guided by its internal grievance procedures, it reasonably responded to Elvig's complaints. Nonetheless, the dissent, seeming to view

this case as if it arose on summary judgment and construing the Church's *Book of Order*, finds that the Church's procedure for redressing sexual harassment is "designed to accomplish unmistakably religious goals" and is "animated by religious criteria." Even if this is so, the Church has not argued that its religious doctrine tolerates sexual harassment or compelled the Church to respond to Elvig's complaints in ways that would be seen as unreasonable in the context of proving its *Ellerth/Faragher* affirmative defense.

Thus, what is left open, as we expressly held in *Bollard*, is a restricted, secular inquiry: whether Elvig can carry her burden of proving she was sexually harassed and, if she can, whether the Church can prove its affirmative defense. "Nothing in the character of [the inquiry] will require ... evaluat[ion of] religious doctrine or the 'reasonableness' of the religious practices followed [by the church]." 196 F.3d at 950. The reasonableness component of the *Ellerth/Faragher* affirmative defense evaluates an employer's *actions* in responding to sexual harassment rather than the motivations for that response. In particular, "the reasonableness of an employer's remedy ... depend[s] on its ability to stop harassment." *Ellison v. Brady*, 924 F.2d 872 (9th Cir.1991); *see also Nichols*, 256 F.3d at 875 ("In this circuit, as in others, remedies [for sexual harassment] should be reasonably calculated to end the harassment.") (internal quotation marks omitted) (alteration in *Nichols*). In short, the issue is what the Church *did*, and its response to Elvig's complaints and the texts guiding its actions can be subjected to secular legal analysis.[6]

6. *See EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 466 (D.C.Cir.1996) ("[A] court [may] interpret provisions of religious documents involving ... non-doctrinal matters *as long as*

the analysis can be done in purely secular terms.") (internal quotation marks omitted); *Smith v. Raleigh Dist. of N.C. Conference of United Methodist Church*, 63 F.Supp.2d 694,

If the Church and the dissent are correct that the Church exercised reasonable care (and that Elvig herself acted unreasonably), then the Church might well prevail on summary judgment. But the merits of the Church's affirmative defense, which we must presume to be nil at this stage of the proceedings, provide no First Amendment basis for shielding the Church from its obligation to protect its employees from harassment when extending such protection would not contravene the Church's doctrinal prerogatives or trench upon its protected ministerial decisions. Indeed, if we were to ignore *Bollard* and adopt a rule that the First Amendment bars Elvig from even stating a Title VII claim—out of speculation that the affirmative defense *might* somehow involve some doctrinal component—we would be affording blanket First Amendment protection to churches that unreasonably fail to address clear instances of sexual harassment, such as unwanted sexual advances, *see Bollard,* 196 F.3d at 944; *McKelvey,* 800 A.2d at 845–46; sexual intimidation including "comment[s] inviting oral sex" and discussions of bestiality, *see Pa. State Police v. Suders,* —— U.S. ——, ——, 124 S.Ct. 2342, 2347, 159 L.Ed.2d 204 (2004); or barrages of unwelcome sexual commentary and pornography, *see Holly D. v. Cal. Inst. of Tech.,* 339 F.3d 1158, 1176 (9th Cir. 2003), even when no protected ministerial

choice or church doctrine is in fact involved. As *Bollard* makes clear, accommodating Title VII's mandate and the First Amendment's strictures does not mean peremptorily dismissing all sexual harassment claims brought by ministers against churches.

\* \* \* \*

In sum, because we must "simply defer without further inquiry" into the tangible employment actions Elvig suffered, *Bollard,* 196 F.3d at 947, those actions may not give rise to Title VII liability for the Defendants. The extent of our deference is limited, however. It requires only that the Church here, as in *Bollard,* be permitted to raise the *Ellerth/Faragher* affirmative defense. Thus, Elvig's sexual harassment claim is limited to three questions: (1) Was Elvig subjected to a hostile environment? (2) If so, did the Church exercise reasonable care to correct that environment? (3) Did Elvig unreasonably fail to avail herself of those measures? *See Nichols,* 256 F.3d at 877. These are the same *restricted, secular* questions posed by Bollard's suit, the answers to which do not require interpretations of religious doctrine or scrutiny of the Defendants' ministerial choices.[7] Therefore, the ministerial exception does not entirely foreclose Elvig's sexual harassment claim.

714 (E.D.N.C.1999) (holding First Amendment did not bar review of grievance procedures contained in defendant's *Book of Discipline,* in hostile environment claim based on alleged harassment of lay employees by a minister, because "[e]ven religious documents may be examined or interpreted regarding non-doctrinal matters if the analysis can be done in purely secular terms" (citing *Jones,* 443 U.S. at 604, 99 S.Ct. 3020)).

7. *Cf. Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.,* 493 U.S. 378, 396, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (upholding the application of state sales and use taxes to

religious organizations because "the critical question is not whether the materials [being taxed] are religious, but whether there is a sale or a use, a question which involves only a secular determination"); *Hernandez v. C.I.R.,* 490 U.S. 680, 696–97, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ("[R]outine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no 'detailed monitoring and close administrative contact' between secular and religious bodies, does not of itself violate the nonentanglement command." (citations omitted)).

## IV. ELVIG'S RETALIATION CLAIM

■■ Elvig alleges that the Defendants also violated Title VII by retaliating against her for lodging sexual harassment complaints with the Church and the EEOC. To make out a prima facie case of retaliation under Title VII, *see* 42 U.S.C. § 2000e–3, Elvig must show that " '(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision.' " *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065–66 (9th Cir.2003) (quoting *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir.2003)). "[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000). Under this definition, the universe of potential adverse employment actions for retaliation claims is larger than the universe of potential tangible employment actions that can subject an employer to vicarious liability for harassment. *See id.* at 1242–44 & n. 5. For example, retaliatory harassment can be an adverse employment action giving rise to a retaliation claim. *See id.* at 1244–45.

Here, Elvig has alleged five retaliatory adverse employment actions: (1) the removal of certain duties, (2) her suspension, (3) her termination, (4) the refusal to permit the circulation of her personal information form and (5) retaliatory harassment in the form of verbal abuse and intimidation. As discussed previously, the first four of these actions are protected ministerial decisions. As in the sexual harassment context, Elvig is foreclosed as a matter of law from relying on these protected decisions as acts of retaliation.

■ The retaliatory harassment Elvig alleges—verbal abuse and intimidation—is not a protected employment decision, however, and thus may be a valid basis for a retaliation claim.[8] *See id.* at 1244–45. Elvig may, consistent with the First Amendment, show the three elements of a retaliation claim: that she engaged in a protected activity, that she suffered an adverse employment action and that there is a causal connection between the protected activity (Elvig's sexual harassment complaints) and the adverse employment action (the retaliatory harassment). Again, however, the Defendants may invoke First Amendment protection from Title VII liability if they claim that the alleged retaliatory harassment was doctrinal, although they have not done so. *See Bollard*, 196 F.3d at 944, 947. In the absence of such a religious justification, Elvig's allegation of retaliatory harassment states a retaliation claim that survives the ministerial exception.[9]

8. Substantial portions of the dissent are actually devoted to agreeing with our conclusion that the Church's decisions to terminate Elvig and refuse the circulation of her personal information form are protected. Regarding Elvig's retaliation claim, the dissent's only disagreement with our approach is its conclusion that churches must be shielded from liability for non-doctrinal, sexual harassment visited upon ministers in retaliation for complaining about hostile work environments.

9. Analogizing to arbitration, the dissent concludes that we should dismiss Elvig's suit because she vowed "to be governed by [the] Church's polity, and to abide by its discipline." Insofar as the dissent means to suggest that Elvig's vow triggers the ministerial exception, we respectfully disagree. Permitting Elvig's suit to proceed would not, as the dissent implies, effectively overrule the Church's religious authority to discipline Elvig. Unlike in typical Title VII cases, where firing an employee for complaining about harassment could amount to retaliation, here we foreclose Elvig from pursuing any claims relying on her termination or other protected ministerial decisions or doctrinally motivated actions, which Elvig argues were taken in

## V. REMEDIES

█ Just as the ministerial exception precludes Elvig from alleging Title VII *claims* that implicate the Defendants' protected ministerial decisions, it similarly precludes her from seeking *remedies* that implicate those decisions. For example, a court may not order the Defendants to permit the circulation of Elvig's personal information form; to do so would effectively overrule a protected employment decision.

Further, unlike Bollard, who quit his employment in what he alleged was a constructive discharge, Elvig was suspended and later fired by the Defendants. That distinction, although not fatal to Elvig's hostile environment claim, leaves her with fewer remedial options than we permitted Bollard to pursue. *See Bollard,* 196 F.3d at 947 (permitting Bollard to recover lost wages because "constructive discharge in the context of Bollard's Title VII sexual harassment claim functions only to signal his estimation of the severity of the harassment and to lay the foundation for including lost wages in a calculation of damages."). As we have explained, the termination of Elvig's ministry and her inability to find other pastoral employment are consequences of protected employment decisions. Consequently, a damage award based on lost or reduced pay Elvig may have suffered from those employment decisions would necessarily trench on the Church's protected ministerial decisions. The same would be true of emotional distress or reputational damages attributable to those decisions. On the other hand, Elvig may recover for emotional distress and reputational harm caused by the sexual harassment itself—or by retaliatory harassment—because such harassment implicates only Pastor Ackles' alleged decision to harass Elvig and the Church's decision not to remedy that harassment, decisions the ministerial exception does not protect.[10] Accordingly,

retaliation for her complaints. Although we do permit Elvig to pursue her retaliatory harassment claim, the Defendants have not argued that they engaged in or permitted harassment in order to discipline Elvig for breaking her vows, which would imply that they did so for protected reasons.

Insofar as the dissent believes Elvig's vow may constitute an arbitration agreement binding her to forgo judicial recourse for harassment, we leave this secular question—raised at oral argument by *amici curiae* Presbyterian Church (U.S.A.) and Synod of Alaska Northwest—for the Defendants to pose in the district court (if they so choose) and, if necessary, for the district court to decide in the first instance. We do note, however, that if the Defendants press the arbitration argument on remand, the district court would have to decide such issues as whether Elvig's vow, which does not appear to have forfeited judicial remedies explicitly, could constitute an "arbitration" agreement forfeiting precisely those remedies under Washington law. *Cf. Tjart v. Smith Barney, Inc.,* 107 Wash.App. 885, 28 P.3d 823, 829 (2001) (concluding a valid arbitration agreement existed where

"[t]he Application that Tjart signed indicates that controversies related to Tjart's employment, or termination of her employment, were subject to arbitration"). Even if Elvig's vow might constitute an arbitration agreement, the district court would also have to consider whether Washington would enforce an arbitration agreement naming the employer or its governing body as the sole arbitrator and leaving to the employer the resolution of all disputes between it and its employee. *Cf. M.A. Mortenson Co. v. Timberline Software Corp.,* 140 Wash.2d 568, 998 P.2d 305, 315 (2000) (regarding as substantively unconscionable a mandatory arbitration clause that required the use of a French arbitration company, payment of a nonrefundable advance fee and travel fees, and payment of the loser's attorney fees (citing *Brower v. Gateway 2000, Inc.,* 246 A.D.2d 246, 676 N.Y.S.2d 569 (1998))). We express no opinion as to the merits of these issues.

10. Title VII places a cap on the total amount of compensatory damages that may be awarded for "emotional pain" and other nonpecuniary loses. *See* 42 U.S.C. § 1981a(b)(3).

because any damages awarded to Elvig based on emotional distress or reputational harm attributable to harassment would be "limited and retrospective," she may on remand attempt to prove that she suffered such damages. *See Bollard,* 196 F.3d at 950.

## VI. DISCOVERY LIMITS

Elvig may therefore proceed within the parameters we have discussed. These parameters unequivocally make the Defendants' protected employment decisions off limits, both as touchstones of liability and as proper subjects of discovery. As in *Bollard,* therefore, the ensuing litigation will not cause excessive entanglement. Excessive entanglement involves *"pervasive* monitoring," *Agostini v. Felton,* 521 U.S. 203, 234, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), or continuing governmental inspection of a religious organization's "day-to-day operations," *Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.,* 493 U.S. 378, 395, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990).[11] These dangers are severely curtailed where, as here, the inquiry is secular and limited to the discovery process.

In *Holly D. v. California Institute of Technology,* to take an example involving a secular employer, we held that the employer had established a reasonable mechanism for addressing sexual harassment after considering the employer's written policy and training programs, both of which the employer made available to its employees. 339 F.3d at 1177. We also rejected the plaintiff's contention that the policy had been unreasonably implemented, citing the employer's willingness to interview all relevant witnesses and to respond promptly when it learned of the offending employee's conduct. *Id.* at 1177–78. A similar inquiry in this case would involve only "secular judgments" focusing on the reasonableness of the employer's antiharassment policy and practices. *See Bollard,* 196 F.3d at 950.

Moreover, as in *Bollard,* "the ability of the district court to control discovery" will guard against "a wide-ranging intrusion into sensitive religious matters." *Id.* Significantly, the district court's control over discovery has been enhanced since our 1999 *Bollard* decision. In 2000, the Federal Rules of Civil Procedure were amended "to involve the court more actively in regulating the breadth of sweeping or conten-

**11.** *See, e.g., Agostini,* 521 U.S. at 233–35, 117 S.Ct. 1997 (holding that monthly visits by supervisors to parochial school classrooms to ensure that remedial education provided by public school teachers remained secular did not result in excessive entanglement); *Bowen v. Kendrick,* 487 U.S. 589, 615–617, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (holding there was no excessive entanglement where government reviews the adolescent counseling program set up by religious institution grantees, including the educational materials used by such grantees, and monitors the program by periodic visits to ensure funds are not used for religious purposes); *Tony & Susan Alamo Found. v. Sec'y of Labor,* 471 U.S. 290, 305, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (stating that nonentanglement principle "does not exempt religious organizations from such sec-

ular governmental activity as fire inspections and building and zoning regulations" or the record keeping requirements of the Fair Labor Standards Act (citation omitted)); *Roemer v. Bd. of Pub. Works of Md.,* 426 U.S. 736, 764–765, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (holding there was no excessive entanglement where State conducts annual audits to ensure that categorical state grants to religious colleges are not used to teach religion). *But see Lemon,* 403 U.S. at 621–622, 91 S.Ct. 2105 (holding school-aid statute authorizing government inspection of parochial school records created an impermissible "intimate and continuing relationship between church and state" because it required the state "to determine which expenditures are religious and which are secular").

tious discovery." Fed.R.Civ.P. 26 advisory committee's notes. In particular, the new rules limit the breadth of discovery ·that can occur absent court approval. Under Rule 26(b)(1), for example, discovery must now relate more directly to a "claim or defense" than it did previously, and "if there is an objection that discovery goes beyond ·material relevant to the parties' claims ·or defenses, the court would become involved." *Id.; see also* Fed.R.Civ.P. 30(d)(2) (2004) (limiting depositions to one day of seven hours, absent stipulation or court order).

Thus, the litigation will not, as the dissent argues, delve open-ended and unfettered into the "internal workings" of ·the Church, whatever those might be. The inquiry entailed by Elvig's suit will be at least as circumscribed, if not more so, ·as the· inquiry we permitted in *Bollard,* and will involve entanglement between church and state "no greater than that attendant on any other civil suit a private litigant might pursue against a church." *Bollard,* 196 F.3d at 950.[12] The litigation will focus on the specific, discrete and secular issues we have identified as salient to Elvig's viable Title VII claims. As we have explained previously, these issues concern the Defendants' actions, not their beliefs. Thus, Elvig's claims are not susceptible to "discovery ... designed to probe the mind of the church in the selection of its ministers." *Rayburn,* 772 F.2d at 1171.

## VII. STATE LAW CLAIMS

When the district court dismissed Elvig's claims under Title VII, it also dismissed her various state law claims under the federal supplemental jurisdiction statute, 28 U.S.C. § 1367(c). Because we hold that Elvig has stated a valid sexual harassment claim under Title VII, the dismissal of her state claims is no longer warranted.

12. Courts in the following cases held that the First Amendment did not bar claims against religious institutions. *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.,* 196 F.3d 409, 430–31 (2d Cir.1999) (allegations of fiduciary relationship between diocese and parishioner for child sexual abuse by priest); *Smith v. O'Connell,* 986 F.Supp. 73, 81–82 (D.R.I.1997) (minor's claim of sexual molestation against priest and church for negligent supervision);· *Nutt v. Norwich Roman Catholic Diocese,* 921 F.Supp. 66, 74 (D.Conn. 1995) (negligent employment based upon alleged sexual abuse of altar boys by priest); *Rashedi v. Gen. Bd. of Church of Nazarene,* 203 Ariz. 320, 54 P.3d 349, 354–55 (Ct.App. 2002) (parishioner's cause of action for negligent hiring); *Bear Valley Church of Christ v. DeBose,* 928 P.2d 1315, 1318 (Colo.1996) (various tort claims brought by child against pastor and church for "pattern of inappropriate touching" that arose during counseling relationship); *Moses v. Diocese of Colo.,* 863 P.2d 310, 321 (Colo.1993) (adult parishioner's claims against bishop and diocese for breach of fiduciary duty and negligent hiring and supervision grounded on sexual relationship between parishioner and priest during the course of counseling); *Malicki v. Doe,* 814 So.2d 347, 351 (Fla.2002) (religious institution's alleged negligence in failing to prevent harm from sexual assault on a minor or adult parishioner by one of its clergy); *Konkle v. Henson,* 672 N.E.2d 450, 456 (Ind.Ct.App. 1996) (negligent hiring and supervision claims against church brought by child victim of sexual molestation); *Kenneth R. v. Roman Catholic Diocese,* 229 A.D.2d 159, 654 N.Y.S.2d 791, 795–96 (N.Y.App.Div.1997) (child's negligent supervision and retention claims against diocese); *Smith v. Privette,* 128 N.C.App. 490, 495 S.E.2d 395, 396 (1998) (claim of negligent retention and supervision against church arising out of minister's alleged "inappropriate, unwelcome, offensive and nonconsensual acts of a sexual nature"); *Erickson v. Christenson,* 99 Or.App. 104, 781 P.2d 383, 386 (1989) (tort claims against church for actions of pastor who engaged in sexual relations with plaintiff during course of counseling relationship when plaintiff was a minor); *C.J.C. v. Corp. of the Catholic Bishop of Yakima,* 138 Wash.2d 699, 985 P.2d 262, ·277 (1999) (tort claims brought by sexual abuse victim against priest and church).

If the district court reaches the merits of Elvig's state law claims on remand, it will have to determine whether any or all of the claims survive the ministerial exception. *See Bollard*, 196 F.3d at 950 ("Just as there is a ministerial exception to Title VII, there must also be a ministerial exception to any state law cause of action that would otherwise impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers."). "Whether the exception applies in a particular instance will depend on the nature of the state law claim and its associated remedy...." *Id.*[13]

## CONCLUSION

Our deference to the Defendants' ministerial decisions means that Elvig cannot succeed on any claim predicated upon such decisions. Notwithstanding that deference, however, Elvig has stated viable claims of sexual harassment (subject to the *Ellerth/Faragher* affirmative defense) and retaliation (based on her allegation that she suffered retaliatory harassment). We stress, however, that in both the sexual harassment and retaliation contexts, Elvig may not rely on protected ministerial decisions—the removal of certain duties, her suspension, her termination and the refusal to permit the circulation of her personal information form—as bases for the Defendants' liability under Title VII. If successful on the merits, Elvig may recover damages for emotional distress and reputational harm that she can prove were caused by the relevant harassment.

Our dissenting colleague, unreconciled to the governing authority of *Bollard*, suggests we go too far in applying *Bollard* here. We respect his concerns but believe his arguments go well beyond anything either *Bollard* or we in this case have actually held or permitted. First, we emphasize this case—as did *Bollard*—comes to us on only the pleadings, where all we have before us are Elvig's complaint and the Church's answer, and only the district court's ruling that Elvig failed to state a claim as a matter of law. Thus the dissent's extensive factual recitation; its speculative prejudgment of what evidence may be produced or found relevant on a summary judgment motion or at any trial that may be warranted; and its predictions of extensive, "microscopic" discovery are—with respect—rhetorical. In short, the dissent would hold that a minister may be subjected to sexual harassment that Congress in enacting Title VII made clear should not be tolerated in the workplace; that once a woman (or man) becomes a minister, the First Amendment requires that she (or he) surrender all rights to protection against such harassment even if the church's doctrine neither condones nor tolerates the harassment; and that the federal courts are off limits because they are incapable of providing nuanced relief that respects both the individual rights Congress enacted and a church's constitutional right to be free of doctrinal interference. We respectfully disagree. The First Amendment should not require that churches become sanctuaries for sexual harassment by those who act outside of church doctrine. Neither *Bollard*, nor the narrow scope of Title VII relief we have taken pains carefully to articulate here, does more than assure that our religious institutions honor their secular obligations not to sexually harass those who have been called to become ministers of their faiths.

13. The Church has also alleged that Elvig's state claims are barred by the religious freedom provision of the Washington Constitution. Wash. Const., art. 1, § 11. We express no view on the merits of this argument.

**REVERSED and REMANDED for further proceedings consistent with this opinion.**

GOULD, Circuit Judge, concurring:

I concur in Judge Fisher's opinion, believing that it follows with logic and persuasive reasoning in light of our circuit's precedent in *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940 (9th Cir.1999). Although I have misgivings whether *Bollard* was correctly decided, it binds us unless and until altered by an en banc panel or the United States Supreme Court.

TROTT, Circuit Judge, Dissenting:

After a three-judge panel decided *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940 (9th Cir.1999), we took a vote on whether to rehear the case en banc. The vote failed. Judge Wardlaw, joined by Judges Kozinski, O'Scannlain, and Kleinfeld, then crafted a persuasive dissent from our standard order denying rehearing, a disquisition which has turned out to be prescient. With oracular foresight, she said,

> As the district court wrote, "[t]he ministerial exception is a well-established compromise between two extremely important interests—the interest in eradicating discrimination in employment and the right of a church to manage its religious affairs free from governmental interference." The panel opinion deviates from that well-established compromise, counter to Supreme Court authority and that of our sister circuits. Because the panel's decision portends serious consequences for one of the bedrock principles of our country's formation—religious freedom—it is undeniably an issue of exceptional importance.

*Bollard v. California Province of the Society of Jesus*, 211 F.3d 1331, 1332 (9th Cir.2000) (citation omitted).

And here, we are with the predicted serious consequences: the Presbyterian Church, as a hierarchical religious institution, will now be compelled in federal court affirmatively to defend as reasonable its formal internal processing and handling of an ordained minister's sexual harassment and retaliation claims against another ordained minister and their Church, and be potentially liable for money damages. A secular federal court jury has been given the authority to invade, to evaluate, and to overrule the Presbyterian Church's final judgment to which the Church says the plaintiff was bound to accept by her religious vows. My able colleagues have done their eloquent best formidably to explain their well-articulated views; but, and with all respect, I simply see this case differently.

## BACKGROUND

Borrowing from the district court's order dismissing Elvig's complaint for failure to state a claim for which relief can be granted, and from other documents in the record, the relevant facts and circumstances at the center of this case—which materially distinguish it from *Bollard*—are as follows.

Elvig served as an ordained Associate Pastor of the Calvin Presbyterian Church in Shoreline, Washington from December 2000 to December 2001. The position of associate pastor is a permanent position in the Church's hierarchy as a minister of the Word and Sacrament. In order to be ordained as a minister, a candidate must formally vow to be "governed by our Church's polity, and to abide by its discipline." *Book of Order*, G–14.0405b.(5).

Elvig alleges that shortly after commencing her pastorship at the Church,

Rev. Ackles began a course of sexually harassing and intimidating conduct towards her. The conduct claimed to be actionable involved winking, allegedly undressing Elvig with his eyes, and other forms of unwelcome verbal attention which she interpreted as harassing. Elvig did not succumb to Rev. Ackles alleged harassment, and she has not offered any allegation that somehow her job was in jeopardy if she did not do so.

The formal governing processes of The Presbyterian Church, found in its *Book of Order,* include a published disciplinary judicial process. The process, designated as part of the *Rules of Discipline,* is initiated by filing a written statement of an offense. Pursuant to this process, Elvig filed an "Accusation by Individual as a Statement of Offense" against Rev. Ackles with the North Puget Sound Presbytery on June 25, 2001.

When Elvig filed her Accusation, she was assigned, as contemplated by the Presbyterian ecclesiastical judicial process, a three-member response team from the Church's Committee on Ministry. The purpose of the response team was to assist her and provide advice and support while the investigating committee considered her charge and during any appeals.

Pursuant to the Church's *Book of Order,* Elvig's allegations were referred to an impartial Investigating Committee comprised of three women and two men. The Investigating Committee charged with deciding Elvig's allegations possessed the authority and responsibility under Church law and procedure to make a thorough inquiry, call witnesses before it, examine all relevant documents, resolve discrepancies in testimony, and make a determination whether the charge could be proved. The Committee's ultimate task was to decide whether charges should be filed against the person accused.

The Investigating Committee fully discharged its formal obligations and ultimately issued a determination on October 3, 2001. The Committee came to a unanimous decision that internal charges would not be lodged against Rev. Ackles.

As was her right pursuant to the *Rules of Discipline,* Elvig filed a Petition for Review of the Investigating Committee's decision on October 29, 2001. The Permanent Judicial Commission of the Presbytery[1] then reviewed the matter *de novo.* On December 4, 2001, the Commission affirmed the decision of the Investigating Committee.

On October 3, 2001, Elvig filed a charge with the EEOC against the Church and the Presbytery, alleging that she had been sexually harassed by the pastor of the Church. Elvig alleges also that, after she filed her complaint, Rev. Ackles began a course of retaliatory action against her, including verbal abuse and other intimidating behavior. On December 4, 2001, the Presbytery placed Elvig on unpaid leave, and on December 19, informed her that it had formally voted "to dissolve the pastoral relationship between Calvin Presbyterian Church and the Rev. Monica McDowell Elvig," terminating her pastoral appointment, but not her membership in the Church. In January 2002, the Presbytery declined, as was its prerogative under Church governance to allow plaintiff to circulate her personal information file "at this time" to other churches, permission that is required by Presbyterian Church policies and procedures to seek another pastoral position. *See Book of Order,* G-14.0311.

---

1. The Presbytery is a corporate expression of the Church consisting of all the churches and ministers of the Word and Sacrament within a certain district.

During this process, the Church attempted to mediate the situation with Elvig. First, Rev. Ackles offered mediation with a trained counselor. Elvig refused. Second, the Presbytery offered to mediate the situation with Elvig. She refused. Third, the Church agreed to mediation when she filed her first charge of discrimination with the EEOC. She refused. Fourth, after the second charge of discrimination was filed with the EEOC regarding retaliation, the Church again agreed to mediate. She ultimately refused.

## ANALYSIS

### A.

Elvig's case is not easily legally pigeon-holed because, although this episode arguably culminated in a tangible employment action against her, i.e., she lost her position as an associate pastor and was denied permission to seek a similar position with another church, the ministerial exception bars her from pursing redress on that basis. As the majority correctly explains, "[b]ecause the Church cannot be required to articulate a justification for its ministerial decision, Elvig cannot show that those decisions were tangible employment actions related to the hostile environment to which she was subjected." Accordingly, pursuant to Supreme Court precedent, she is left with an action against the Church only for its alleged mishandling of her supervisor's alleged sexual harassment, known as the "hostile environment prong" of Title VII. *Holly D. v. Cal. Inst. of Tech.,* 339 F.3d 1158, 1167 (9th Cir.2003) (citing *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662

(1998)). In this respect, she must prove that she was the victim of a hostile work environment caused by "severe or pervasive sexual harassment." *Id.* at 1176.

However, the Supreme Court has established an affirmative defense to such a claim, a defense called the "reasonable care" defense.[2] *Holly D.,* 339 F.3d at 1176–77. As recently explained by the Court in *Pennsylvania State Police v. Suders,* —— U.S. ——, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), pursuant to this defense,

[T]he employer may defeat vicarious liability for supervisor harassment by establishing, as an affirmative defense, both that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Ellerth* and *Faragher* also clarified the parties' respective proof burdens in hostile environment cases. Title VII, the Court noted, "borrows from tort law the avoidable consequences doctrine," under which *victims have "a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of the statute."* The *Ellerth /Faragher* affirmative defense accommodates that doctrine by requiring plaintiffs reasonably to stave off avoidable harm. But both decisions place the burden squarely on the defendant to prove that the plaintiff failed to avoid or reduce harm.

---

**2.** Ironically, this defense might not be available to the Church if Elvig's claim of a tangible employment action were not blocked by the First Amendment. *Holly D.,* 339 F.3d at 1173.

*Id.* at ——, 124 S.Ct. 2342, 2353 (citations omitted).

"Following *Ellerth* and *Faragher,* the legal standard for evaluating an employer's efforts to prevent and correct harassment ... is ... whether the employer's actions as a whole established a reasonable mechanism for prevention and correction." *Holly D.,* 339 F.3d at 1177.

Thus, when the Church tenders its "reasonable care defense," *every step* the Church took to respond and react to Elvig's claims will be reviewed by the district court to determine whether it was reasonable. Such an inquiry into whether the Church exercised "reasonable care" will involve, by necessity, penetrating discovery and microscopic examination by litigation of the Church's disciplinary procedures and subsequent responsive decisions. For an example of how the resolution of these issues will unfold, one need look no farther than *Holly D.* and our judgmental and detailed analysis of Caltech's behavior in connection with its motion for summary judgment. *See id.* at 1176–79. Such a searching analysis will now be applied to the internal workings of the Church.

## B.

The attempt to negate the Church's adjudicatory process as simply an "internal grievance procedure," as Elvig does here, fails to acknowledge its ecclesiastical underpinnings. As revealed by the Church's *Rules of Discipline,* the process about to come under secular legal scrutiny is inextricably intertwined with the Church's religious tenants and is in actuality an integral aspect of its ecclesiastical mission. In Chapter I of these *Rules,* the Preamble reveals this truth:

*Church discipline is the church's exercise of authority given by Christ,* both in the direction of guidance, control, and nurture of its members and in the direction of constructive criticism of offenders. Thus, *the purpose of discipline is to honor God by making clear the significance of membership in the body of Christ;* to preserve the purity of the church by nourishing the individual within the life of the believing community; to correct or restrain wrongdoing in order to bring members to repentance and restoration; to restore the unity of the church by removing the causes of discord and division; and to secure the just, speedy, and economical determination of proceedings. In all respects, members are to be accorded procedural safeguards and due process, and it is the intention of these rules so to provide.

*Rules of Discipline,* Chapter I, D–1.0101 (emphasis added).

The power that Jesus Christ has vested in his Church, *a power manifested in the exercise of Church discipline,* is one for building up the body of Christ, not for destroying it, for redeeming, not for punishing. *It should be exercised as a dispensation of mercy and not of wrath so that the great ends of the Church may be achieved,* that all children of God may be presented faultless in the day of Christ.

*Id.* at D–1.0102 (emphasis added).

Elvig's primary retaliation claim, as articulated during oral argument, is that "by withholding permission to circulate her resume to another church, they are retaliating against her." Counsel explained that "if you look at the *Book of Order,* it says that they can only [withhold permission] if charges are brought against Rev. Elvig, which they were not." It follows, counsel argued, that because the Church did not follow the *Book of Order* "on its face," a claim of retaliation is appropriate. This was the exchange between the court and counsel that followed:

The Court: Aren't you asking us to adjudge whether the Church followed the *Book of Order* ... ?

Counsel: Whether there was a good faith reason for what they did, that's the burden under retaliation.

The Court: So whether the Church had a good faith reason.

Counsel: Correct.

Not unexpectedly, the Church argues that counsel's interpretation of the *Book of Order* is wrong, and that, in any event, it is the Church that is entitled to construe its *Book of Order* and decide when a resume can be circulated, not the federal courts.

### C.

I come now to a highly significant issue: the effect of Elvig's vows "to be governed by our Church's polity, and to abide by its discipline." *Book of Order,* 6–14.0405b.(5). The Church argues that these vows, which Elvig took voluntarily and without which she could not have become an ordained minister, do not allow her to bring her dispute with the Church to any civil court. The Church asserts that by bringing this lawsuit, Elvig "broke her vow," and says that the "act of filing suit violates Church doctrine; if this Court allows the action to proceed, it gives state-sanctioned approval for ministers to violate Church doctrine." The Church asks us to recognize her vow as dispositive and as a critical factor distinguishing this case from *Bollard.*

By analogy, the Church draws our attention to *E.E.O.C. v. Luce, Forward, Hamilton & Scripps,* 345 F.3d 742 (9th Cir.2003) (en banc), where we held that the Civil Rights Act of 1991 does not preclude enforcement of global agreements requiring arbitration of Title VII claims as a condition of employment. In so holding, we focused on § 118 of the 1991 Act, which provides that:

[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the acts or provisions of federal law amended by this Title.

Pub.L. No. 102–166, § 118, 105 Stat. 1071 (codified at Notes to 42 U.S.C. § 1981). I seriously doubt that we would conclude that the Church's internal process for resolving disputes and accusations is not authorized by law. Indeed, Title VII's design was "to encourage the creation of antiharassment policies and effective grievance mechanisms," *Ellerth,* 524 U.S. at 764, 118 S.Ct. 2257, in order "to promote conciliation rather than litigation." *Id.* Granted, the formal arbitration pursuant to the Federal Arbitration Act of a Title VII claim is not precisely the same as the resolution of a sexual harassment claim pursuant to a church's disciplinary mechanism, but post-*Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), potential Title VII plaintiffs frequently find themselves resolving their problems and grievances in venues other than the judicial system. *Gilmer* clearly dispelled the notion that the judicial forum cannot be waived for Title VII claims. Moreover, section 118 is not limited to formal arbitration as the only appropriate means of dispute resolution, leaving open other avenues for reconciliation.

At some point on remand, the district court will have to assess and to deal with the effect of Elvig's vows. Will the Court ignore those vows? Will it second-guess the Church and construe them so as not to require her to be bound by the process she herself invoked? Will her vows to submit to the authority of her Church on these matters be invalidated? Whatever the Court does with the vows, this lawsuit

cannot go forward without rejecting a critical aspect of the Church's ordination requirements. I see no way we can cope with this serious issue without profound and excessive substantive entanglement with Church doctrine. Such an intrusion—even if not clumsy—will necessarily trespass upon ground that belongs to the Church.

### D.

To sum up, what we have before us is a final decision wrought in accord with a Church's formal judicial process designed to accomplish unmistakably religious goals, a final decision, which Elvig took formal vows to respect in order to be ordained as a minister and which was animated by religious criteria unknown to the civil law in its resolution of civil lawsuits and designed to accomplish the "great ends of the Church." I respectfully disagree with the majority that somehow the trial they envision—including Elvig's charge involving the *Book of Order* of unlawful retaliation—will involve "a purely secular inquiry," as the facts and circumstances of this case clearly demonstrate. It is simply wishful thinking to believe that because civil laws against sexual harassment do not conflict with church doctrine, this lawsuit and the judicious control of discovery will not violate the Church. With all respect to my colleagues, does not this view overlook the essence of the Church's defense and the effect of Elvig's vows? I do not understand how discrete parts of this episode can be neatly isolated from the whole. What will now occur in federal court amounts to wholesale substantive and procedural entanglement with the business of the Church.

The majority opinion, again with all respect, fails to assign appropriate significance to the fact that this controversy is about ministers, the meaning of their vows, their behavior inside the Church, and their fitness to hold their positions. The Fifth Circuit recognized the clear implications of this special scenario in *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.1972):

> The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.

*Id.* at 553.[3]

The Eight Circuit honored this principle in *Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360 (8th Cir. 1991):

> Personnel decisions by church-affiliated institutions affecting clergy are *per se* religious matters and cannot be reviewed by civil courts, for to review such decisions would require the courts to determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made.

*Id.* at 363.

When the focus of this matter is shifted from the abstract to the concrete, it becomes clear that Elvig's lawsuit—even as trimmed by my colleagues—will entail a

---

**3.** The ministerial exception is exactly what its short form title implies: a narrowly tailored exemption compelled by the First Amendment encompassing matters involving ministers and their respective churches. The exception does not provide shelter from the criminal law, nor from behavior—as compared to belief—such as bigamy and polygamy; and neither does it shield the Church as employer from the laws of general application relating to regular lay employees.

judicial review of the Church's governance, procedures, and decisions in handling her accusations. The affirmative defense with which the Church is left is that it handled Elvig's accusations in a reasonable way. What did the Church ultimately do to prevent or correct harassment? Nothing. Why? Because after conducting a full-blown investigation, it did not credit her accusations. This is the decision that may become the basis for civil liability. Elvig argues that by doing nothing to stop the harassment, she "automatically" wins. This argument is not persuasive. Moreover, her accusations, the Church's judgment, and this episode became grounds for her removal as an associate pastor and the Church's declination to allow her to circulate her resume. Was all of this reasonable? Was it retaliation? Did the refusal to circulate her resume to other churches violate the *Book of Order?* Can part of this episode be isolated from the whole? Did Elvig's four refusals to mediate within the Church demonstrate that she "unreasonably failed in her duty to take advantage of corrective opportunities" made available to her by the Church? The federal courts will now decide. This affirmative burden will require the Church in court to justify not only its entire disciplinary process, but also its ultimate decisions—including the bona fides of its decision *not* to take corrective action. Thus, I repeat, the internal governance of the Church vis-à-vis two ministers will be on trial. This situation, which will involve gross substantive and procedural entanglement with the Church's core functions, its polity, and its autonomy, seems precisely what the ministerial exception was designed to cover and to prevent. The Church may have to pay damages to Elvig if a federal court decides that its resolution of an issue between ministers was unreasonable, i.e., that the considered judgment of the Presbytery was wrong, that her refusal to mediate within the Church was reasonable, and that her vows do not mean what they say.

### E.

The Supreme Court began in earnest to tackle the scope of the Free Exercise Clause in this context in 1871 in the seminal case of *Watson v. Jones,* 13 Wall. 679, 20 L.Ed. 666 (1871). That case involved a schism within the Presbyterian Church resulting in an intramural battle between two factions for control of the Walnut Street Church in Louisville, Kentucky, and of its ministry. The dispute landed first in the Circuit Court of the United States for the District of Kentucky, and then in the Supreme Court. The Court took great pains to articulate the principles which it believed covered such disputes. The Court said, in connection with what the Court later defined in 1975 as "controversies that incidentally affect civil rights....", *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976),

> In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Watson,* 80 U.S. at 727.

The Court continued:

> In this country the full and free right to entertain any religious belief, to practice

any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who united themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decision should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organization itself provides for. *Id.* at 728–29; *see also Kedroff v. Saint Nicholas Cathedral,* 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (explaining that the *Watson* "opinion radiates … a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine").

Ninety-five years later, after the First Amendment had been made applicable to the states via the Fourteenth Amendment,[4] the Supreme Court confronted a case wherein the Serbian Orthodox Church had removed a Bishop from his position in response to a dispute between rival factions over control of church property. Bishop Milivojevich brought in Illinois courts a civil action against the church seeking reinstatement. He prevailed, and his victory was affirmed by the Illinois Supreme Court. The United States Supreme Court granted certiorari "to determine whether the actions of the Illinois Supreme Court constituted improper judicial interference with decisions of the highest authorities of a hierarchical church in violation of the First and Fourteenth Amendments." *Milivojevich,* 426 U.S. at 698, 96 S.Ct. 2372. In ruling for the church, the Court not only affirmed its earlier pronouncements in *Watson,* but also said in the service of the First Amendment,

> For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church adjudicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them.

*Milivojevich,* 426 U.S. at 713, 96 S.Ct. 2372.

Moreover, insofar as the Church here will be called upon in the presentation of its affirmative defense to open for exami-

---

4. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

nation its actions as well as its judgment and to defend its construction of its *Book of Order* and its ordination vows, *Milivojevich* holds that such a detailed review is constitutionally forbidden:

> [T]he Supreme Court of Illinois ... invalidated the decision to defrock Dionisije on the ground that it was "arbitrary" because "a detailed review of the evidence discloses that the proceedings resulting in Bishop Dionisije's removal and defrockment were not in accordance with the prescribed procedure of the constitution and the penal code of the Serbian Orthodox Church." Not only was this "detailed review" impermissible under the First and Fourteenth Amendments, but in reaching this conclusion, the court evaluated conflicting testimony concerning internal church procedures and rejected the interpretation of relevant procedural provisions by the Mother Church's highest tribunals.

*Id.* at 718, 96 S.Ct. 2372 (internal citations omitted).

The Court's summary of its holdings was terse and to the point:

> In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.
> Reversed.

*Id.* at 724–25, 726, 96 S.Ct. 2372.

If this lawsuit were to have been filed in the Fifth Circuit, I do not believe it could have gone forward in whole or in part. In *Combs v. Cen. Tex. Annual Conference of United Methodist Church,* 173 F.3d 343 (5th Cir.1999), the Circuit held in a Title VII gender and pregnancy discrimination case that the lawsuit was barred by the Free Exercise Clause of the First Amendment, i.e., the "ministerial exception." Drawing from longstanding Circuit precedent,[5] the court held:

> The first concern is that secular authorities would be involved in evaluating or interpreting religious doctrine. *Id.* The second quite independent concern is that in investigating employment discrimination claims by ministers against their church, secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal. *Id.* This second concern is the one present here. This second concern alone is enough to bar the involvement of the civil courts.

> In short, we cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread, the internal management of a church.

*Id.* at 350.

A similar fate would be almost certain had this case originated in the Eleventh Circuit. In *Gellington v. Christian Methodist Episcopal Church,* 203 F.3d 1299 (11th Cir.2000), the plaintiff's Title VII claims of sexual harassment, retaliation, and constructive discharge were held barred by the ministerial exception. Drawing from the Fifth Circuit's decision in *McClure,* the court said,

---

5. *McClure v. Salvation Army,* 460 F.2d 553    (5th Cir.1972).

We noted in *McClure* "[t]he relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose." 460 F.2d at 558–559. An attempt by the government to regulate the relationship between a church and its clergy would infringe upon the church's right to be the sole governing body of its ecclesiastical rules and religious doctrine.

Furthermore, applying Title VII to the employment relationship between a church and its clergy would involve "excessive government entanglement with religion" as prohibited by the Establishment Clause of the First Amendment. *See Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Investigation by a government entity into a church's employment of its clergy would almost always entail excessive government entanglement into the internal management of the church.

*Gellington*, 203 F.3d at 1304.

The same terminal fate would attach to this case in the Seventh Circuit; *see Young v. N. Ill. Conference of United Methodist Church*, 21 F.3d 184, 187–88 (7th Cir.1994) (holding that the Free Exercise Clause precluded Title VII gender and race discrimination claims for denial of promotion and discontinuance of status as a minister); *Alicea–Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir.2003) ("The 'ministerial exception' applies without regard to the type of claims being brought."), as well as in the D.C. Circuit, *see E.E.O.C. v. Catholic Univ. of Am.*, 83 F.3d 455, 464–67 (D.C.Cir.1996) (holding that nun's Title VII sexual discrimination suit following her denial of university tenure was barred by the Religion Clauses), the First Circuit, *see Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1577–78 (1st Cir.1989) (holding

that clergyman's wrongful termination action against not-for-profit religious corporation barred by Free Exercise Clause), and the Fourth Circuit, *see Rayburn v. General Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1169–72 (4th Cir. 1985) (holding that Title VII sex and race discrimination claims brought against church for denial of pastoral position were barred by the Religion Clauses).

### CONCLUSION

As the Fifth Circuit said in *Combs*,

This case involves the interrelationship between two important governmental directives—the congressional mandate to eliminate discrimination in the workplace and the constitutional mandate to preserve the separation of church and state. As this Court previously observed in *McClure*, both of these mandates cannot always be followed. In such circumstances, the constitutional mandate must override the mandate that is merely congressional.

*Id.* at 351.

The majority's decision has approved part of a misconceived lawsuit which, with all respect, is an unconstitutional violation of and an invasion by the federal government into the Church's core prerogatives and autonomy. If the wall between Church and state is to be respected, it cannot be a one-way wall. The Supreme Court and the Courts of Appeals following its lead have never been distracted by the discrete civil legal cause of action pleaded by lawyers, be it one of property as in *Watson*, or employment rights as in *Milivojevich*, *Combs*, *McClure*, and *Gellington*. Courts, except for ours in *Bollard*, have always seen through that secular civil legal veil to the underlying constitutional right at issue: the Religion Clauses of the First Amendment.

I believe this case to be distinguishable from *Bollard.* In *Bollard,* the plaintiff was not an ordained priest; he was only a novitiate. In *Bollard,* the plaintiff had not taken a required ordination vow "to be governed by our Church polity, and to abide by its discipline." And, in *Bollard,* the plaintiff had not engaged a Church's internal disciplinary process and followed it through to a final result. However, if *Bollard* somehow does compel this result, then *Bollard* is wrong, as suggested by Supreme Court and sister circuit court precedent; and we should revisit this issue en banc. Thus, although I agree with my learned colleagues' partial shearing of Elvig's complaint, I respectfully dissent as to their decision that two causes of action— (1) retaliatory verbal abuse, and (2) intimidation and hostile work environment—may proceed.

Finally, my analysis of this case does not arise from a view that churches should be sanctuaries for sexual harassment—or that sexual harassment ought to be tolerated anywhere—but simply from a view of the First Amendment that my colleagues do not share.