**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BIBIJI INDERJIT KAUR PURI;
RANBIR SINGH BHAI; KAMALJIT
KAUR KOHLI; KULBIR SINGH
PURI,
        *Plaintiffs-Appellants*,

v.

SOPURKH KAUR KHALSA;
PERAIM KAUR KHALSA; SIRI
RAM KAUR KHALSA; SIRI KARM
KAUR KHALSA; KARTAR SINGH
KHALSA; KARAM SINGH
KHALSA; ROY LAMBERT;
SCHWABE, WILLIAMSON &
WYATT, an Oregon Professional
Corporation; LEWIS M.
HOROWITZ; LANE POWELL PC,
an Oregon Professional
Corporation; UNTO INFINITY,
LLC, an Oregon Limited
Liability Company; SIRI SINGH
SAHIB CORPORATION, an Oregon
non-profit corporation; DOES, 1
through 5,
        *Defendants-Appellees*.

No. 13-36024

D.C. No.
3:10-cv-01532-MO

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, Chief District Judge, Presiding

Argued and Submitted March 10, 2016
Portland, Oregon

Filed January 6, 2017

Before: Raymond C. Fisher, Marsha S. Berzon
and Paul J. Watford, Circuit Judges.

Opinion by Judge Fisher

**SUMMARY**[*]

**First Amendment**

The panel vacated the district court's dismissal, as foreclosed by the Free Exercise and Establishment Clauses of the First Amendment, of claims concerning a dispute over the control of two nonprofit entities associated with the Sikh Dharma religious community.

The panel held, based only on the pleadings, that the claims were not barred by the First Amendment's ministerial exception. The panel held that the ecclesiastical abstention doctrine did not apply because the claims could be resolved by application of neutral principles of law without

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

encroaching on religious organizations' right of autonomy in matters of religious doctrine and administration.

The panel addressed additional issues in a concurrently filed memorandum disposition.

## COUNSEL

Surjit P. Soni (argued) and Leo E. Lundberg, Jr., The Soni Law Firm, Pasadena, California; R. Scott Palmer, Watkinson Laird Rubenstein Baldwin & Burgess P.C., Eugene, Oregon; for Plaintiffs-Appellants.

Paul J.C. Southwick (argued) and John F. McGrory, Jr., Davis Wright Tremaine LLP, Portland, Oregon, for Defendants-Appellees Unto Infinity, LLC; Siri Singh Sahib Corporation; Kartar Singh Khalsa; Karam Singh Khalsa; Peraim Kaur Khalsa; Siri Karm Kaur Khalsa; and Sopurkh Kaur Khalsa.

Janet M. Schroer (argued), Portland, Oregon; Ralph E. Cromwell, Jr., Byrnes Keller Cromwell LLP, Seattle, Washington; for Defendants-Appellants Schwabe, Williamson & Wyatt.

Susan E. Watts (argued), Portland, Oregon; Joseph C. Arellano, Kennedy Watts Arellano LLP, Portland, Oregon, for Defendants-Appellees Lane Powell PC and Lewis M. Horowitz.

Leslie S. Johnson, Kent & Johnson LLP, Portland, Oregon, for Defendant-Appellee Siri Ram Kaur Khalsa.

Stephen C. Voorhees and Candice R. Broock, Kilmer Voorhees & Laurick PC, Portland, Oregon, for Defendant-Appellee Roy Lambert.

Susan Bower and Rebecca M. Auten, Assistant Attorneys General; Anna M. Joyce, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon Department of Justice, Salem, Oregon; for Amicus Curiae State of Oregon.

## OPINION

FISHER, Circuit Judge:

This appeal concerns a dispute over the control of two nonprofit entities associated with the Sikh Dharma religious community. The plaintiffs, the widow and children of the late spiritual leader of the Sikh Dharma faith, brought claims against various individuals and entities alleging several interlocking conspiracies and fraudulent activities designed to exclude them from certain management positions and to convert millions of dollars in assets from entities under the individual defendants' control for personal benefit. The district court dismissed the plaintiffs' complaint, concluding their claims were foreclosed by the Free Exercise and Establishment Clauses of the First Amendment.[1] We vacate

---

[1] This opinion addresses only the defendants' First Amendment defense to the plaintiffs' direct claims. The plaintiffs also brought several derivative claims on behalf of Siri Singh Sahib Corporation and Unto Infinity, LLC. In a concurrently filed memorandum disposition, we affirm dismissal of those derivative claims. The memorandum disposition also addresses the parties' remaining arguments regarding the plaintiffs' direct claims.

the district court's dismissal because we conclude, based only on the pleadings, that the plaintiffs' claims are not barred by the First Amendment's ministerial exception and can be resolved by application of neutral principles of law without encroaching on religious organizations' right of autonomy in matters of religious doctrine and administration.

## BACKGROUND

This case comes to us on the pleadings, so we accept the plaintiffs' factual allegations as true. Our review is limited to the facts alleged in the plaintiffs' first amended complaint ("complaint") and the attached exhibits incorporated by reference therein. *See Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 953 (9th Cir. 2004).

Yogi Harbhajan Singh Khalsa, also known as Yogi Bhajan, was a spiritual leader and entrepreneur who spread Sikhism and Kundalini Yoga in the United States beginning in the 1960s. In 1971, he was designated the Siri Singh Sahib, the Sikh leader for the Western Hemisphere. Yogi Bhajan founded or inspired the creation of numerous for-profit and nonprofit entities that were held and controlled by Siri Singh Sahib of Sikh Dharma (SSSSD), a California corporation sole of which he was the only shareholder.[2] Three of these entities are particularly relevant to this case: Siri Singh Sahib Corporation, Unto Infinity, LLC, and Sikh Dharma International.

---

[2] Under California law, a corporation sole is a corporation "formed . . . by the bishop, chief priest, presiding elder, or other presiding officer of any religious denomination, society, or church, for the purpose of administering and managing the affairs, property, and temporalities thereof." Cal. Corp. Code § 10002.

Yogi Bhajan formed Siri Singh Sahib Corporation (SSSC) as an Oregon nonprofit religious corporation "to act as the successor legal organization to [SSSSD]" following his death or incapacity, "and in such capacity to conduct and/or facilitate religious, charitable and educational activities." SSSC would become "the guardian of those assets of [SSSSD] which are conveyed to it," and would replace SSSSD as the sole member of Unto Infinity, LLC. Yogi Bhajan was the sole director, or "trustee," of SSSC at its founding, but the SSSC articles of incorporation provided that following his death or incapacity, "the directors shall be those persons designated in writing by [Yogi Bhajan]," with such written designation to be "delivered to, and held in confidence by, the attorney for the corporation." The articles also set out certain religious criteria for directors:

> No individual will be eligible to be designated or elected as a trustee unless he or she . . . is currently qualified as a minister of Sikh Dharma; . . . is an active participant in Dasvandh [tithing]; . . . [and] is then living, and participating in the affairs of the Sikh community, in a manner consistent with the teachings and values of [Yogi Bhajan], and accepts the directives and proclamations of [Yogi Bhajan] as Siri Singh Sahib of Sikh Dharma, as such teachings, values, directives, and proclamations are understood by the Siri Sikdar Sahib/a of Sikh Dharma . . . .

Yogi Bhajan formed Unto Infinity, LLC (UI), as an Oregon nonprofit limited liability company to serve as a member or shareholder of various for-profit and nonprofit entities. Under UI's operating agreement, SSSSD was to be

the sole member of UI until Yogi Bhajan's death or incapacity, at which time SSSC would assume that role, and UI would become the sole member of Sikh Dharma International. Acting by virtue of his exclusive control over SSSSD, Yogi Bhajan appointed himself and four others to the UI board of managers, which would "exercise full and exclusive control over the affairs of the Company, subject to restrictions on that authority under the Oregon Limited Liability Company Act." The UI operating agreement set forth the same religious eligibility criteria for its board of managers as the SSSC articles established for its directors.

Yogi Bhajan formed Sikh Dharma International (SDI) as a California nonprofit religious corporation "organized to advance the religion of Sikh Dharma and as an association of religious organizations teaching principles of Sikh Dharma, including by ordination of ministers of divinity and operation of places of worship." SDI's sole member is UI.

Yogi Bhajan died in October 2004. He was survived by the plaintiffs in this case – his wife, Bibiji Inderjit Kaur Puri ("Bibiji"), and their three children, Ranbir Singh Bhai ("Ranbir"), Kamaljit Kaur Kohli and Kulbir Singh Puri. They allege the general counsel and five board members of UI and SSSC conspired to exclude them from participating in the management of those organizations.

First, the plaintiffs assert they have been improperly excluded from the SSSC board of trustees. They allege Yogi Bhajan, acting pursuant to the SSSC articles of incorporation, designated all four of them to become board members following his death or incapacity and furnished the written designation to defendant Roy Lambert, attorney for SSSC. Lambert allegedly failed to produce the designation following

Yogi Bhajan's death, and the defendants then held board meetings without providing notice to the plaintiffs and without the plaintiffs' attendance, in violation of SSSC bylaws and Oregon law. Second, the plaintiffs allege the UI board of managers added Bibiji as a manager of UI on July 26, 2004, prior to Yogi Bhajan's death, by unanimous written consent, but the defendants failed to inform her of her election and denied her the rights and duties of board membership.

In support of their claims, the plaintiffs point to various emails and corporate documents, attached to their complaint and incorporated by reference, that they allege confirm their allegations of wrongful exclusion from the SSSC and UI boards. On July 26, 2004, all five members of the UI board of managers apparently adopted a resolution increasing the membership of the board to six and electing Bibiji "to fill the new position as manager of the Corporation." In October 2004, defendant Sopurkh Kaur Khalsa ("Sopurkh"), president of the UI board of managers, left a voicemail message for plaintiff Ranbir explaining that she and Lambert were "proceeding on getting you guys on the Board" of SSSC and UI. Sopurkh followed up by email with a "Memo of Understanding" acknowledging that Bibiji was "already on [the] board" of UI and confirming that all four plaintiffs would be added to the SSSC and UI boards. In September 2005, Sopurkh apparently changed course, explaining to Bibiji that the previous Memo of Understanding "inadvertently omitted a statement regarding the corporate involvement of you and your children," and the "[m]emo was not intended to indicate either current board membership for you and your children or agreement that you and your children would ultimately be elected to the listed boards." Sopurkh furnished a "revised Memo of Understanding which

corrects the prior error," clarifying that the memo constituted her "understanding of the family's request to be included in the various boards in our organization." The revised document nonetheless reiterated Bibiji was "already on [the] board" of UI. Two months later, when Lambert sent an email listing "the board of [SSSC] as designated by [Yogi Bhajan]," two of the plaintiffs' names appeared on the list.

The plaintiffs' complaint seeks a judgment that Bibiji "has been a Manager of UI from and after July 26, 2004" and that all four plaintiffs "be appointed to the Board of Trustees of SSSC." They also seek damages for lost compensation they would have received for their services on the boards. After the defendants moved to dismiss for failure to state a claim upon which relief can be granted, *see* Fed. R. Civ. P. 12(b)(6), the plaintiffs moved for leave to file a second amended complaint. The district court granted the defendants' motions to dismiss, denied the motion for leave to amend and entered a judgment of dismissal with prejudice. The plaintiffs timely appealed.

## STANDARD OF REVIEW

We review de novo a district court's dismissal for failure to state a claim upon which relief can be granted. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). We accept as true all well-pleaded allegations of material fact and construe them in the light most favorable to the plaintiffs. *See id.* We also review de novo a district court's legal determinations, including constitutional rulings, and its determinations on mixed questions of law and fact that implicate constitutional rights. *See Berger v. City of Seattle*, 569 F.3d 1029, 1035 (9th Cir. 2009) (en banc).

## DISCUSSION

The question before us is whether the Free Exercise and Establishment Clauses of the First Amendment preclude a civil court from granting relief on the plaintiffs' claims, which seek declaratory and injunctive relief in the form of placement on the management boards of organizations associated with the Sikh Dharma religious community as well as damages for lost compensation due to their previous exclusion from those boards. The defendants raise the "ministerial exception" as an affirmative defense, and contend even if that exception does not apply, the plaintiffs' claims still cannot be decided by a civil court because the requested relief would infringe on the sphere of autonomy constitutionally guaranteed to religious organizations.

## I.

## A.

The Supreme Court has long recognized religious organizations' broad right to control the selection of their own religious leaders. *See, e.g.*, *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16 (1929). Recently, the Court "confirm[ed] that it is impermissible for the government to contradict a church's determination of who can act as its ministers," and formally recognized "a 'ministerial exception,' grounded in the First Amendment, that precludes application of [employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 704–05 (2012). This ministerial exception "ensures that the authority to select and control who will minister to

the faithful – a matter 'strictly ecclesiastical' – is the church's alone." *Id.* at 709 (citation omitted) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)). The Court explained:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at 706.

Although the Supreme Court has not articulated the scope of the ministerial exception beyond employment discrimination claims, *see id.* at 710, our court has framed the exception as applicable "to any state law cause of action that would otherwise impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers." *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999); *see also Werft v. Desert Sw. Annual Conference of United Methodist Church*, 377 F.3d 1099, 1100 n.1 (9th Cir. 2004).

Thus, any claim "with an associated remedy . . . [that] would require the church to employ [a minister]" would "interfer[e] with the church's constitutionally protected choice of its ministers," and thereby "would run afoul of the Free Exercise Clause." *Bollard*, 196 F.3d at 950. The ministerial exception also bars relief for "consequences of protected employment decisions," such as damages for "lost or reduced pay," because such relief "would necessarily trench on the Church's protected ministerial decisions." *Elvig*, 375 F.3d at 966; *see also Hosanna-Tabor*, 132 S. Ct. at 709 ("An award of such relief would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination.").

## B.

The ministerial exception is an affirmative defense. *See Hosana-Tabor*, 132 S. Ct. at 709 n.4. It applies to claims that impinge on protected employment decisions regarding "a religious organization and its ministers," *Elvig*, 375 F.3d at 955 (quoting *Bollard*, 196 F.3d at 945), and when applicable, it flatly prohibits courts from "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so," *Hosanna-Tabor*, 132 S. Ct. at 706.

As an affirmative defense, the ministerial exception can serve as the basis for dismissing a complaint at the pleadings stage under Rule 12(b)(6) only when the elements of the defense appear *on the face of the complaint*. *See Jones v. Bock*, 549 U.S. 199, 215 (2007) (citing 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)); *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013). Therefore, if it is apparent

on the face of the plaintiffs' complaint that the defendants' refusal to seat the plaintiffs on the disputed boards is a "protected employment decision[]" under the ministerial exception, *see Elvig*, 375 F.3d at 963, the plaintiffs' claims are altogether barred, and a civil court can neither order the defendants to employ the plaintiffs nor award damages against the defendants for past or future failure to do so.

The defendants argue the complaint should be dismissed under the ministerial exception because it seeks relief for a protected employment decision made by a religious organization concerning its ministers. Specifically, they contend the complaint alleges both that SSSC and UI are "religious organizations" covered by the exception, and that the disputed board positions are "ministerial" because they can be occupied only by individuals meeting certain "religious requirements," including that they be Sikh ministers. The plaintiffs do not dispute SSSC and UI are religious organizations within the meaning of the ministerial exception, but they argue the board positions are *not* ministerial because, on the face of the complaint, it is not apparent their duties involve conveying the church's message or carrying out its religious mission.[3]

As a threshold matter, it is not clear that the ministerial exception could ever apply to the *type* of positions at issue here. This is a dispute over seats on the boards of corporate entities that are apparently affiliated with a church, but are

---

[3] The plaintiffs also argue the religious requirements for SSSC board membership do not apply to them, relying on an exhibit attached to their disallowed second amended complaint. We do not reach this argument because, even assuming the plaintiffs are subject to the religious requirements, we conclude the ministerial exception does not apply.

not themselves churches. Thus, the positions are far afield from the "paradigmatic application of the ministerial exception" to ordained ministers employed by a church, such as Roman Catholic priests who "minister to the faithful" as that term is generally understood. *See Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288, 1291 (9th Cir. 2010) (en banc). Neither the Supreme Court nor this court has applied the ministerial exception to the governing boards of church-affiliated organizations, let alone to those whose responsibilities are largely secular, as the complaint alleges here. There is, therefore, reason to question whether the exception is even potentially implicated.

At the same time, neither the Supreme Court nor this court has ever expressly limited the ministerial exception to particular types of positions, and both courts have expressly declined to adopt any bright line rule defining the scope of the exception. As the Supreme Court has made clear, there is no "rigid formula for deciding when an employee qualifies as a minister" within the meaning of the ministerial exception. *Hosanna-Tabor*, 132 S. Ct. at 707. Our en banc court echoed that view in *Alcazar*, where we "declined to adopt any particular test" for "determining whether a particular church employee . . . should be considered a 'minister'" for First Amendment purposes. 627 F.3d at 1291. Certain language in *Hosanna-Tabor*, moreover, suggests a fairly broad application of the exception. The Court explained "[t]he ministerial exception is not limited to the head of a religious congregation," and insulates a religious organization's "selection of those who will personify its beliefs." *Hosanna-Tabor*, 132 S. Ct. at 706–07. The Court further suggested the exception extends to "the Church's choice of its hierarchy" when that choice implicates "a religious group's right to shape its own faith and mission."

*Hosanna-Tabor*, 132 S. Ct. at 705–06.   We too have suggested a potentially broad reach for the exception. *See Bollard*, 196 F.3d at 947 (referring to the ministerial exception as protecting "a church's freedom to choose its representatives").   In practice, there may be little difference between deciding whether a defendant has established the affirmative defense of the ministerial exception with respect to a hiring decision for a particular employment position in a particular case and deciding categorically whether the exception applies to hiring decisions for an entire type or class of employment positions, such as governing boards of church-affiliated organizations.   As explained below, the former analysis considers, among other things, "the nature of the religious functions performed" and "[t]he amount of time an employee spends on particular activities."   *Hosanna-Tabor*, 132 S. Ct. at 709.   Any categorical analysis likely would turn on very similar inquiries.

Ultimately, we do not attempt to resolve the question of whether the ministerial exception ever applies to the type of positions at issue here.  We need not categorically define the scope of the ministerial exception, because even if it is potentially available in a case such as this one, it is clear the defendants here have failed to make out the defense at this juncture.  For the purpose of the following analysis, therefore, we only assume without deciding that the exception is potentially implicated with respect to the type of positions in dispute in the case before us.

The Supreme Court has provided some guidance on the circumstances that might qualify an employee as a minister within the meaning of the ministerial exception.  First, an employee is more likely to be a minister if a religious organization holds the employee out as a minister by

bestowing a formal religious title. *See id.* at 707. Although an ecclesiastical title "by itself, does not automatically ensure coverage, the fact that an employee has been ordained or commissioned as a minister is surely relevant." *Id.* at 708. A second consideration is the "substance reflected in that title," such as "a significant degree of religious training followed by a formal process of commissioning." *Id.* at 707–08. Third, an employee whose "job duties reflect[] a role in conveying the Church's message and carrying out its mission" is likely to be covered by the exception, even if the employee devotes only a small portion of the workday to strictly religious duties and spends the balance of her time performing secular functions. *Id.* Finally, an employee who holds herself out as a religious leader is more likely to be considered a minister. *Id.*

Based on the pleadings here, some circumstances weigh in favor of considering the board positions ministerial. The complaint alleges that a "mission and purpose" of SSSC and UI is "to benefit the Sikh Dharma community and to advance and promote [Yogi Bhajan's] teachings," and it is "surely relevant" that their board members must be ordained ministers of Sikh Dharma and must meet certain other religious criteria. *See id.* at 708.

But, based on the face of the complaint, a number of other circumstances weigh against applying the ministerial exception. First, and most importantly, the pleadings do not allege the board members have any ecclesiastical duties or privileges. In assessing the responsibilities attendant to the board positions, it is relevant that the entities involved are not themselves churches, but rather corporate parents of a church. SSSC's primary responsibility appears to be holding title to church property, and UI, in addition to being the sole member

of SDI – i.e., the direct corporate parent of the Sikh Dharma church – owns and controls a portfolio of for-profit and nonprofit corporations, including a major security contractor and a prominent tea manufacturer. Although the complaint alleges the board members have "fiduciary duties to UI and SSSC to hold assets in trust for the benefit of the Sikh Dharma community," it is not clear on the face of the complaint that these duties are "religious" or "reflect[] a role in conveying the Church's message and carrying out its mission." *Id.*

No religious duties comparable to those found relevant in *Hosanna-Tabor* appear in the pleadings here. In *Hosanna-Tabor*, the Supreme Court observed the plaintiff was "expressly charged . . . with 'lead[ing] others toward Christian maturity' and 'teach[ing] faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church.'" *Id.* "In fulfilling these responsibilities, [the plaintiff] taught her students religion[,] . . . led them in prayer[,] . . . took her students to a school-wide chapel service, and . . . took her turn leading it, choosing the liturgy, selecting the hymns, and delivering a short message based on verses from the Bible." *Id.* The Court concluded, "[a]s a source of religious instruction, [the plaintiff] performed an important role in transmitting the Lutheran faith to the next generation." *Id.* By contrast, none of the allegations here support a similar conclusion.

Although the Court has cautioned against relying too heavily on "the relative amount of time . . . spent performing religious functions," it has recognized that "the nature of the religious functions performed" and "[t]he amount of time an employee spends on particular activities" are relevant

considerations. *Id.* at 709. We, too, have "look[ed] to the function of the position . . . in deciding whether the ministerial exception applies," *Elvig*, 375 F.3d at 958, and have held, for instance, that the exception does not apply "to lay employees of a religious institution if they are not serving the function of ministers," *Bollard*, 196 F.3d at 947. The pleadings do not allege the board members "serv[e] the function of ministers." *Id.*

Second, the pleadings do not allege the board members are held out as religious leaders, either by their respective employers or by the board members themselves. A board member of UI or SSSC has the job title of "manager" or "trustee," respectively, and the pleadings do not suggest these apparently secular titles hold any ecclesiastical significance in the Sikh Dharma faith. Although a board member must be "qualified as a minister of Sikh Dharma," and although we have held "[t]he paradigmatic application of the ministerial exception is to the employment of an ordained minister," *Alcazar*, 627 F.3d at 1291, this paradigm applies to employment *by a church*, *as a minister*. An employee's status as an ordained minister, standing alone, does not trigger the ministerial exception when that individual is employed in a secular capacity by an entity other than a church. *Cf. id.* at 1292 ("[T]he ministerial exception may not apply to a seminarian who obtains employment with a church outside the scope of his seminary training.").

UI and SSSC are not churches, and although their board members must be independently qualified as Sikh ministers, they are not employed or held out by the organizations *as* ministers. Nor is there any indication the board members hold themselves out as religious leaders. These factors weigh against viewing the board members as "representatives" of

the church or as being "close to the heart of the church." *Alcazar*, 627 F.3d at 1291 (quoting *Bollard*, 196 F.3d at 946–47).

Finally, the pleadings do not show the board positions are religious in substance, whether by requiring "significant religious training," by signifying ecclesiastical merit, or otherwise. *Hosanna-Tabor*, 132 S. Ct. at 707–08. In *Hosanna-Tabor*, the Court gave substantial weight to the six years of rigorous religious training required to become a called teacher, encompassing "college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher." *Id.* at 707. The Court also observed that a teacher could receive her call "only upon election by the congregation, which recognized God's call to her to teach." *Id.* Although it is possible that carrying out the disputed board positions here involves similarly substantial religious training and recognition, the record before us does not reveal what is entailed in becoming "qualified as a minister of Sikh Dharma" and "accept[ing] the directives and proclamations of [Yogi Bhajan] . . . as such teachings, values, and directives are understood by the Siri Sikdar Sahib/a of Sikh Dharma," nor does the record establish any functional connection between the duties of a board member and the religious criteria for selection. Therefore, in construing the allegations of material fact in the light most favorable to the plaintiffs, *see Daniels-Hall*, 629 F.3d at 998, we do not assume the board positions are substantively religious on this motion to dismiss.

Absent any allegation that board members have ecclesiastical duties or are held out to the community as religious leaders, and with scant pleadings on the religious requirements for the positions, we agree with the plaintiffs

that it is not apparent on the face of the complaint that the disputed board positions are "ministerial." Whereas the ministerial exception typically applies to those who are employed by a church to minister to the faithful, this case appears to concern board members who, in that capacity, are neither employed by a church nor employed to minister to the faithful. We do not foreclose the defendants from ultimately establishing that the ministerial exception applies, but the factual allegations in the complaint are too far removed from the core of the exception for us to conclude at this stage of the proceedings that the exclusion of the plaintiffs from the board positions is a "protected employment decision" falling within the ministerial exception affirmative defense.

## II.

Given the defendants cannot at this point rely on the ministerial exception to bar the plaintiffs' claims, we next consider whether other principles of the Free Exercise and Establishment Clauses nonetheless preclude the courts' involvement in the internal affairs of UI and SSSC under what we have previously termed the "doctrine of ecclesiastical abstention." *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987). The plaintiffs do not dispute UI and SSSC are religious organizations protected by the religion clauses of the First Amendment, but they contend the district court can resolve this case without encroaching on that protection.

## A.

Long before it formally recognized a ministerial exception, the Supreme Court developed a doctrine, grounded originally in common law but later in the First Amendment,

"limiting the role of civil courts in the resolution of religious controversies that incidentally affect civil rights." *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 710 (1976).   Under this doctrine of ecclesiastical abstention, "a State may adopt *any* one of various approaches for settling church . . . disputes so long as it involves no consideration of doctrinal matters." *Jones v. Wolf*, 443 U.S. 595, 602 (1979) (quoting *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970) (Brennan, J., concurring)).   The Supreme Court has recognized two principal approaches to deciding church disputes without "jeopardiz[ing] values protected by the First Amendment."   *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969).

The first, derived from *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872), and its progeny, is simply to "accept[] the decision of the established decision-making body of the religious organization."   *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999).

> [W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church . . . but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.

*Milivojevich*, 426 U.S. at 709.   But, recognizing that deference can sometimes lead to entanglement of civil courts in ecclesiastical issues and that some church disputes can be resolved by application of solely secular legal rules, the Court has also articulated an alternative to the *Watson* approach it has termed the "neutral principles of law" approach.  *See Jones*, 443 U.S. at 602, 605.

**1.**

The Court first considered judicial intervention in church disputes in *Watson*, when it was asked to resolve which of two factions rightfully controlled the property of a local Presbyterian church.  *See* 80 U.S. (13 Wall.) at 681.  Ruling on common law grounds, the Court concluded "a broad and sound view of the relations of church and state under our system of laws" requires civil courts to defer to the determinations of a church's highest ecclesiastical authority on "questions of discipline, or of faith, or ecclesiastical rule, custom, or law."  *Id.* at 727.

The Court later applied the *Watson* rule to an individual's claim of entitlement to a chaplaincy in the Roman Catholic Church.  *See Gonzalez*, 280 U.S. at 10–11.  Although the plaintiff was entitled to the position under the terms of a will establishing the chaplaincy, the archbishop had declined to appoint the plaintiff because he lacked the qualifications for the position as prescribed by canon law.  *Id.* at 17–18.  The Court explained:

> Because the appointment is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate

possesses them. In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise.

*Id.* at 16.

The Supreme Court subsequently adopted the holdings of *Watson* and *Gonzalez* as a constitutional rule insofar as they pertained to the "[f]reedom to select the clergy," explaining that a church's freedom to do so, "where no improper methods of choice are proven, . . . must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." *Kedroff*, 344 U.S. at 116; *see also id.* at 116 n.23 (quoting *Gonzalez*, 280 U.S. at 16–17). Under this principle of noninterference, extended to cover judicial action in *Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191 (1960) (per curiam), civil courts may not "[b]y fiat . . . displace[] one church administrator with another" and thereby "pass[] the control of matters strictly ecclesiastical from one church authority to another." *Kedroff*, 344 U.S. at 119. Doing so would "intrude[] for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment." *Id.*

The Supreme Court's early church dispute cases embraced "a spirit of freedom for religious organizations, an independence from secular control or manipulation – in short, power to decide for themselves, free from state interference,

matters of church government as well as those of faith and doctrine." *Id.* at 116. This deferential doctrine recognizes that "First Amendment values are plainly jeopardized when church [disputes are] made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbyterian Church*, 393 U.S. at 449.

This does not mean, however, that civil courts have no role in disputes involving religious organizations. Unlike the ministerial exception, which completely bars judicial inquiry into protected employment decisions, the ecclesiastical abstention doctrine is a qualified limitation, requiring only that courts decide disputes involving religious organizations "without resolving underlying controversies over religious doctrine." *Kianfar*, 179 F.3d at 1248 (quoting *Presbyterian Church*, 393 U.S. at 448).

**2.**

The Court introduced the neutral-principles approach in the context of a property dispute between two local churches that sought to withdraw from the national Presbyterian Church in the United States. *See Presbyterian Church*, 393 U.S. at 441–43. *Presbyterian Church* held that Georgia's departure-from-doctrine rule, an alternative to the *Watson* approach never endorsed by the Court but nonetheless followed by some states, "require[d] the civil courts to engage in the forbidden process of interpreting and weighing church doctrine" and was therefore unconstitutional. *Id.* at 451. In so holding, the Court recognized "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Id.* at 449. But the Court continued:

> It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded.

*Id.*

A year later, in *Maryland & Virginia Eldership*, the Court approved the Maryland high court's use of the neutral-principles approach to resolve a church property dispute between a regional church and two secessionist congregations. *See* 396 U.S. at 367–68 (per curiam). The Maryland Court of Appeals "relied upon provisions of state statutory law governing the holding of property by religious corporations, upon language in the deeds conveying the properties in question to the local church corporations, upon the terms of the charters of the corporations, and upon provisions in the constitution of the General Eldership pertinent to the ownership and control of church property." *Id.* at 367 (footnote omitted) (citing 254 A.2d 162 (Md. 1969)). The Court rejected the petitioners' argument that this application of neutral state law principles "deprived the General Eldership of property in violation of the First Amendment" and dismissed the appeal for want of a substantial federal question, because "the Maryland court's resolution of the dispute involved no inquiry into religious doctrine." *Id.* at 367–68.

In a concurrence to the per curiam opinion in *Maryland & Virginia Eldership* later drawn on by a majority of the Court in *Jones v. Wolf*, *see* 443 U.S. at 602–03, Justice Brennan explained, "a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Md. & Va. Eldership*, 396 U.S. at 368 (Brennan, J., concurring). "Thus the States may adopt the approach of *Watson v. Jones*, and enforce the property decisions made" by a church's highest ecclesiastical authority. *Id.* at 368–69 (citation omitted) (citing *Watson*, 80 U.S. (13 Wall.) at 722, 724). But "the use of the *Watson* approach is consonant with the prohibitions of the First Amendment only if the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into religious policy." *Id.* at 370. Alternatively, "'[n]eutral principles of law, developed for use in all property disputes,' provide another means for resolving litigation over religious property." *Id.* (citation omitted) (quoting *Presbyterian Church*, 393 U.S. at 449). For example, when "the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy," courts can avoid becoming impermissibly entangled in that ecclesiastical dispute by "determin[ing] ownership by studying deeds, reverter clauses, and general state corporation laws." *Id.* at 369–70.

In *Jones*, the Court definitively held that "civil courts, consistent with the First and Fourteenth Amendments to the Constitution, may resolve [church property] dispute[s] on the basis of 'neutral principles of law.'" 443 U.S. at 597. The Court observed:

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice.

*Id.* at 603. The Court recognized "the application of the neutral-principles approach is [not] wholly free of difficulty" as it may, for instance, "require[] a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church." *Id.* at 604. "In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts." *Id.* Furthermore, "there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property," and, "[i]f in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* (citing *Milivojevich*, 426 U.S. at 709). Despite these challenges, the Court concluded "[o]n balance, . . . the promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in application." *Id.*

Property disputes have proved especially amenable to application of the neutral-principles approach. *See Kianfar*, 179 F.3d at 1249. But we are unaware of any authority or reason precluding courts from deciding other types of church disputes by application of purely secular legal rules, so long as the dispute does not fall within the ministerial exception and can be decided "without resolving underlying controversies over religious doctrine." *Presbyterian Church*, 393 U.S. at 449; *see also Milivojevich*, 426 U.S. at 710 ("This principle applies with equal force to church disputes over church polity and church administration."). Indeed, "we must be careful not to deprive religious organizations of all recourse to the protections of civil law that are available to all others," because "[s]uch a deprivation would raise its own serious problems under the Free Exercise Clause." *Kianfar*, 179 F.3d at 1248.

**B.**

**1.**

The Supreme Court has made clear that "a State may adopt *any* one of various approaches for settling church . . . disputes so long as it involves no consideration of doctrinal matters." *Jones*, 443 U.S. at 602 (quoting *Md. & Va. Eldership*, 396 U.S. at 368 (Brennan, J., concurring)). It is thus constitutionally permissible for a court to apply either the *Watson* approach (deferring to a church's highest ecclesiastical authority) or the neutral-principles approach to such disputes, as long as the court decides the dispute "without resolving underlying controversies over religious doctrine." *Kianfar*, 179 F.3d at 1248 (quoting *Presbyterian Church*, 393 U.S. at 449). But we are not without further

guidance in deciding the proper approach for cases litigated in federal court.

First, *Jones* suggested a clear preference for the neutral-principles approach, noting that its "promise[] to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice" outweighed occasional difficulties in its application. *Jones*, 443 U.S. at 603–04. Following *Jones*, we held that where a religious entity has adopted civil "legal structures, it is incumbent upon the civil court . . . to apply to those structures the secular law that governs them." *See Kianfar*, 179 F.3d at 1250.[4]

Second, where both approaches are available as a constitutional matter, we have made clear a court may apply the neutral-principles approach even though the *Watson* approach would lead to a contrary result. *See id.* at 1249 (discussing the Supreme Court's approval of a state approach that required a decision "by neutral principles even though the outcome might contravene the decision of the hierarchical church" (citing *Jones*, 443 U.S. at 604–06)).

---

[4] This holding follows from a principle announced in *Watson* itself. *See Jones*, 443 U.S. at 603 n.3 ("[E]ven in *Watson v. Jones*, . . . the Court[] stated that, regardless of the form of church government, it would be the 'obvious duty' of a civil tribunal to enforce the 'express terms' of a deed, will, or other instrument of church property ownership." (quoting *Watson*, 80 U.S. (13 Wall.) at 722–23)). The Court's endorsement of the neutral-principles approach in *Jones* significantly buttressed this principle, and further supported its application where the "legally cognizable form[s]" or structures are embedded within church-related documents, such as corporate charters or even church constitutions. *See Jones*, 443 U.S. 603, 606.

Third, the *Watson* approach is *not* appropriate when "the nature of the religious organization or the identity of its decision-making body is disputed on the basis of religious doctrine." *Id.* at 1248–49. Where the "locus of control . . . [is] ambiguous," *Watson* deference "would appear to require 'a searching and therefore impermissible inquiry into church polity.'" *Jones*, 443 U.S. at 605 (quoting *Milivojevich*, 426 U.S. at 723).

Finally, our general preference in federal cases for resolving claims by applying neutral principles is further supported here by the fact that most claims in this case are based on state law. Oregon law would call for application of the state's neutral-principles approach if this matter were before a state court. *See Hope Presbyterian Church of Rogue River v. Presbyterian Church (U.S.A.)*, 291 P.3d 711, 720–21 (Or. 2012) (outlining a neutral-principles approach after "reexamin[ing] the proper methodology for resolving church property disputes in Oregon" in light of the "new legal context for evaluating church property disputes under the First Amendment" provided by *Jones*).[5]

---

[5] The Supreme Court has not outlined one specific neutral-principles approach, and there may be significant variation in the approaches of various states. *See Jones*, 443 U.S. at 599–610; *see also Church of God in Christ, Inc. v. Graham*, 54 F.3d 522, 526–27 (8th Cir. 1995) (applying Missouri's neutral-principles approach and refusing to apply an element of Michigan's disparate approach). Additionally, other federal circuit courts have considered the appropriate state law to apply to resolve church property disputes when sitting in diversity. *See Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 98 F.3d 78, 92–94 (3d Cir. 1996) (applying New Jersey law, as predicted by federal court, to follow the state's neutral-principles approach); *Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 419 (3d Cir. 2012) (noting "Pennsylvania courts opt to apply neutral civil

In light of the preference to apply neutral principles to enforce secular rights where possible, the Oregon state law character of most of the claims in this case, and Oregon's adoption of the neutral-principles approach, we proceed to determine whether such an approach may be constitutionally applied in this case.

**2.**

It appears a neutral-principles approach "may resolve . . . the disputed . . . issues without significant constitutional difficulties," and is a proper means of resolving this dispute. *Kianfar*, 179 F.3d at 1249. The plaintiffs do not seek recourse to civil courts for resolution of a controversy over religious doctrine. Nor do they ask civil courts to decide whether a religious organization properly applied ecclesiastical rules in settling a leadership dispute, as was true in *Milivojevich*, 426 U.S. at 708, and of the one request for relief we held could not be decided by neutral principles in *Kianfar*, 179 F.3d at 1250. Rather, the plaintiffs here ask the courts to decide what amounts to a secular factual question: under Oregon law and the secular governing documents of UI, an Oregon nonprofit limited liability company, and SSSC, an Oregon nonprofit religious corporation, were the plaintiffs elected or designated to the disputed board positions? This question is quintessentially "susceptible to decision by neutral principles." *Id.* at 1249.

---

law principles whenever possible to resolve such cases" before determining that such approach was improperly applied to an ecclesiastical question). Here, as in *Kianfar*, we do not seek to resolve *which* neutral-principles approach may be properly applied. Rather, our review is limited to the threshold constitutional question of whether the issues raised can be decided *at all* without violating the First Amendment. *See Kianfar*, 179 F.3d at 1248.

At this stage, the parties do not contest whether the plaintiffs meet the religious eligibility requirements for the disputed board positions, and the defendants "do not offer a religious justification" for their failure to seat the plaintiffs on the boards. *Bollard*, 196 F.3d at 947. The dispute, which "concern[s] the [d]efendants' actions, not their beliefs," turns entirely on "what the [defendants] *did*, . . . and the texts guiding [their] actions can be subjected to secular legal analysis." *Elvig*, 375 F.3d at 963, 968. As in *Bollard*, "[t]his is a restricted inquiry. Nothing in the character of th[e] defense will require a jury to evaluate religious doctrine or the 'reasonableness' of the religious practices followed . . . . Instead, the jury must make [only] secular judgments . . . ." *Bollard*, 196 F.3d at 950; *see also Elvig*, 375 F.3d at 963. As this dispute has been presented to us, it appears the district court can resolve it "by relying on state statutes . . . and the terms of corporate charters of religious organizations." *Kianfar*, 179 F.3d at 1249 (citing *Md. & Va. Eldership*, 396 U.S. at 367). Thus, there is "no danger that, by allowing this suit to proceed, we will thrust the secular courts into the constitutionally untenable position of passing judgment on questions of religious faith or doctrine." *Bollard*, 196 F.3d at 947. Under these circumstances, the availability of the neutral-principles approach obviates the need for ecclesiastical abstention.

## C.

Even if ecclesiastical abstention would otherwise preclude resort to civil courts, the plaintiffs contend this dispute is susceptible to judicial review under the so-called "fraud or collusion" exception. *See Askew*, 684 F.3d at 418, 420 ("A doctrinally grounded decision made during litigation to insulate questionable church actions from civil court review

may indeed raise an inference of fraud or bad faith," and "[u]nder those circumstances, the integrity of the judicial system may outweigh First Amendment concerns such that a civil court may inquire into the decision."). Because we hold it is not apparent from the complaint that ecclesiastical abstention applies, we have no occasion to address the fraud or collusion exception here.

## CONCLUSION

"[A]pplying any laws to religious institutions necessarily interferes with the unfettered autonomy churches would otherwise enjoy, [but] this sort of generalized and diffuse concern for church autonomy, without more, does not exempt them from the operation of secular laws." *Bollard*, 196 F.3d at 948. As this case has been presented to us, the defendants have not established that the plaintiffs' claims are barred by the ministerial exception, and the ecclesiastical abstention doctrine does not apply because the dispute is amenable to resolution by application of neutral principles of law. Thus, the district court erred in dismissing the plaintiffs' claims under the First Amendment.

For the reasons stated here and in the concurrently filed memorandum disposition, the judgment of the district court is vacated in part and affirmed in part, and the case is remanded to the district court.

**VACATED IN PART, AFFIRMED IN PART AND REMANDED.**

Each party shall bear its own costs on appeal.