**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JUN 7 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS



| | |
|---|---|
| YAZMIN JUAREZ COYOY, on her own behalf and as a surviving parent of M.J., <br><br> Plaintiff-Appellant, <br><br> v. <br><br> CITY OF ELOY, <br><br> Defendant-Appellee. | No. 19-17539 <br><br> D.C. No. 2:19-cv-01391-JJT-ESW <br><br> MEMORANDUM* |

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted March 1, 2021
Phoenix, Arizona

Before: HAWKINS, BEA, and BUMATAY, Circuit Judges.

Juárez appeals from the district court's grant of Appellee City of Eloy's

motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6). The district court had diversity jurisdiction under 28 U.S.C.

§ 1332, and we have jurisdiction on appeal under 28 U.S.C. § 1291. We affirm.

We review de novo a district court's dismissal for failure to state a claim and

---

* This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

accept as true all well-pleaded allegations of material fact, construing them in the light most favorable to the plaintiff. *Puri v. Khalsa*, 844 F.3d 1152, 1157 (9th Cir. 2017). However, we may consider documents incorporated by reference in the complaint and need not credit as true allegations in the complaint that are contradicted by these documents. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014).

Where the federal government is a party, the interpretation of a contract is governed by federal law. *Chickaloon-Moose Creek Native Ass'n, Inc. v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004). We apply Arizona law to the substantive legal issues of contract law as we believe the Arizona Supreme Court would apply it. *Cf. Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1300 (9th Cir. 1997).

1.   Juárez did not plead facts sufficient plausibly to allege that Eloy owed her or her daughter a duty of reasonable care under § 324A of the Restatement (Second) of Torts. "Arizona has adopted . . . § 324A with respect to a negligent undertaking (or assumed duty)." *Dabush v. Seacret Direct LLC*, 478 P.3d 695, 703 (Ariz. 2021). Section 324A states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking . . . .

2

A duty pursuant to § 324A "may be assumed expressly or by conduct," but to find an actor has assumed a duty "requires affirmative, deliberate conduct such that it is apparent that the actor specifically undertook to perform the task that he is charged with having performed negligently." *Dabush*, 483 P.3d at 703 (quoting *Yost v. Wabash College*, 3 N.E.3d 509, 517 (Ind. 2014)) (cleaned up).

Interpretation of an unambiguous written contract is a question of law. *Beck Park Apartments v. U.S. Dep't of Hous. & Urb. Dev.*, 695 F.2d 366, 369 (9th Cir. 1982). "Federal common law follows the traditional approach for the parol evidence rule: A contract must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the contract." *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 560–61 (9th Cir. 2016) (cleaned up). We have reviewed the Modified Inter-Governmental Services Agreement ("MIGSA") entered into by Eloy and Immigration and Customs Enforcement ("ICE") as incorporated by reference, as well as the related agreements between Eloy and Corrections Corporation of America ("CCA").[1]

We hold Eloy did not undertake to render protective services or to supervise those services at the South Texas Facility under the express or implied terms of the MIGSA, or by conduct.

First, the MIGSA never expressly assigns Eloy by name any duty to render

---

[1] CCA is now known as "CoreCivic."

or supervise the provision of protective services to South Texas Facility detainees, including Juárez or her daughter.  The terms of the MIGSA explicitly assign each of the relevant care and oversight duties to the "Service Provider" or to ICE.  The MIGSA designates Eloy not as Service Provider but as "Contractor/Offeror."

Second, to the extent Arizona law recognizes the ability to assume an implied duty of care under § 324A, *see Dabush*, 250 Ariz. at 703, nothing within the four corners of the MISGA demonstrates that Eloy ever impliedly agreed to perform services as the Service Provider.  The text of the MIGSA is not ambiguous as to whom the parties agreed would assume the duty of providing care to South Texas Facility detainees.  The construction of medical and dental facilities as well as the provision of those facilities' equipment, access for detainees, security staffing, transportation, and quality control were all services that were expressly assigned in the statement of work to the Service Provider.  And the MIGSA provides a clear definition as to who the "Service Provider" was: "The entity, which provides the services described in this statement of work."

The MIGSA does not imply that Eloy was to take on the role of Service Provider unless or until Eloy entered into an agreement assigning a different entity the role of Service Provider.  The MIGSA by its terms defers designation of the Service Provider until the point at which the services were actually provided.  Given that definition, it is simply not reasonable to interpret the MIGSA as

4

designating a Service Provider at the time the contract was signed.  Nor is it reasonable to conclude the Service Provider was by necessity a signatory to the MIGSA.  By placing obligations upon the Service Provider, the MIGSA chose not to designate the "undersigned" or "Contractor/Offeror" or "City of Eloy" as the provider of services, although it easily could have.

This understanding is confirmed elsewhere in the text.  The MIGSA's "Ramp Up Plan" provisions expressly condition the commencement of the contract on CCA—not Eloy—being on site and under contract: "'Start Date' is defined as the later of [*inter alia*] ICE and CCA signing an award document which precipitates the [IGSA] amendment being sent to Eloy" and "the date which CCA is allowed on site per NEPA clearance."  The MIGSA unambiguously assigns protective services to the Service Provider and does not imply Eloy agreed to take on that role.

Finally, Eloy did not undertake any duty by conduct.  The complaint does not allege that Eloy actually performed any of the services of the Service Provider, and the amended agreement between Eloy and CCA confirms that CCA was contractually obligated to "provide services in compliance with the applicable terms of the [MIGSA]" "for every federal resident accepted into custody at the South Texas Facility."

Juárez seeks to introduce ambiguity into the MIGSA to suggest Eloy agreed

5

to be the Service Provider before delegating those duties by subcontract to CCA. But again, the MIGSA unambiguously states the Service Provider is whichever entity that actually performs the described services—it does not anywhere designate Eloy to be the Service Provider unless and until Eloy designates a subcontractor. But even if we were to find an ambiguity in the MIGSA, the facts of Juárez's complaint and the incorporated documents (including a 2018 Department of Homeland Security Office of Inspector General ("DHS OIG") Report which analyzed the MIGSA and the circumstances that gave rise to it), rather than plausibly allege that Eloy agreed to undertake any caretaking responsibilities as the Service Provider, directly contradict that allegation.

First, and most obvious, Eloy was never involved in the drafting or negotiating of the MIGSA. The complaint states "Eloy did not participate in any of the negotiations related to the [South Texas] facility and had no input regarding the proposed IGSA modification." It also accuses Eloy of being nothing more than a "contrived" "middleman," and cites to the DHS OIG Report that concluded that "Eloy's sole function under the modification is to act as the middleman between ICE and CCA."

Second, the terms of the MIGSA, in light of the facts presented in the DHS OIG Report, indicate that CCA—and not Eloy—was at all times the contemplated Service Provider. Under "Acculturation/Adaption," the MIGSA required the

6

Service Provider to provide a personal health and hygiene program for the South Texas Facility detainees and required that this program be delivered "[a]s described in the *Service Provider's response to the ICE RFI* dated 8/7/2014." Yet the complaint maintains that Eloy never participated in negotiations with ICE and the DHS OIG Report states that CCA was the only entity to respond to ICE's July 2014 request for proposals. Another provision of the MIGSA references "the Service Provider's 8/1/2014 Response to IGSA and Statement of Work" and "the Service Provider's Site Layout diagram." Again, the DHS OIG reported that "ICE worked directly with CCA to develop the requirements for the facility; Eloy did not participate in developing the requirements or any other aspect of the negotiations with ICE," and that prior to Eloy becoming involved, "ICE continued negotiating exclusively with CCA" and that the two "establish[ed] the housing layout and pricing schedule[] without input from Eloy." That these August 2014 documents were dated prior to the MIGSA's September 2014 execution date provides significant evidence that CCA was the designated and agreed upon Service Provider. Thus, the terms of the MIGSA, even reviewed in context with the extrinsic evidence provided by allegations of the complaint and the documents attached to and incorporated into the complaint, preclude the conclusion that Eloy was ever the implied Service Provider.

Juárez does not seriously dispute this conclusion. She herself alleges ICE

and CCA schemed to pay Eloy to be a "middleman," which would allow ICE to contract with CCA to be the Service Provider without having to abide by time-consuming federal contracting regulations. That this contrived contractual apparatus may have been illegal does not require us to ignore the unambiguous expressed intent of the parties and instead resolve that Eloy must be held to have agreed to be the Service Provider prior to CCA's designation. That is a non-sequitur. Neither is it relevant that Eloy was a governmental entity and party to an intergovernmental agreement authorized by 8 U.S.C. § 1103(a)(11)(A). This fact again merely shows that Eloy was a middleman, it does not show Eloy was ever contemplated to be the Service Provider. Although this arrangement may have been illegal, it was understood by all parties that Eloy was never to provide services and that understanding is readily apparent in the text of the MIGSA as well as the accompanying incorporated documents. Finally, it is not true that ICE had no recourse for a breach in services at the South Texas Facility. The MIGSA sets forth penalties against the Service Provider for failure to perform and permits ICE to withhold payment from the Service Provider for contract or regulatory violations.

2. Neither did Eloy assume a duty of care by subcontracting with CCA. Like the district court, we have found no authority that suggests the Arizona Supreme Court would conclude Eloy's passive act of subcontracting was an

8

affirmative undertaking of protective services sufficient to impose on it a duty of care under § 324A.  To the extent Juárez now alleges Eloy had a duty based on negligent hiring and retention of CCA, she did not make that claim in her complaint or before the district court, and we will not consider it for the first time on appeal. *Crawford v. Lungren*, 96 F.3d 380, 389 n.6 (9th Cir. 1996).

3.      Because Eloy never assumed a duty of care, we need not address whether the alleged duty is nondelegable.

**AFFIRMED.**